**ASPIRA OF NEW YORK, INC., et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK et al., Defendants.**

No. 72 Civ. 4002.

United States District Court, S. D. New York.

Oct. 22, 1976.

Puerto Rican Legal Defense & Education Fund, Inc., New York City, for plaintiffs; Herbert Teitelbaum, Richard J. Hiller, New York City, of counsel.

W. Bernard Richland, Corp. Counsel of the City of New York, New York City, for defendants; Michael S. Cecere, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Plaintiffs, New York City public school students of Hispanic origin (along with their parents and guardians), are entitled to a program of bilingual education under a consent decree signed on August 29, 1974. The decree was made pursuant to 42 U.S.C. § 2000d, federal regulations and guidelines thereunder, and the Supreme Court's enforcing pronouncements in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The extensive steps required for compliance have placed this court in an increasingly common, but unvaryingly delicate and difficult, role for federal trial courts—the role of supervising faithful performance of tasks that are in their nature primarily administrative rather than judicial. Cf. Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976).[1] The court's assignment in such cases calls for a nice mixture of humility and resolve. On the one hand, seeking to superintend and rule upon intricate and technical programs like the ones in this case, an appointed judge is, or certainly should be, forcefully reminded that "[c]ourts are not the only agency of government that must be assumed to have capacity to govern." Stone, J., dissenting in *United States v. Butler,* 297 U.S. 1, 87, 56 S.Ct. 312, 329, 80 L.Ed. 477 (1936). On the other hand, the rights of the people under the law, when they are duly brought to issue before the court, must be forthrightly declared and enforced.

■ The mandate to decide emerges now in more than routinely tense circumstances: plaintiffs have demanded that the Board of

---

1. "The centerpiece of the emerging public law model is the decree. It differs in almost every relevant characteristic from relief in the traditional model of adjudication, not the least in that it *is* the centerpiece. The decree seeks to adjust future behavior, not to compensate for past wrong. It is deliberately fashioned rather than logically deduced from the nature of the legal harm suffered. It provides for a complex, on-going regime of performance rather than a simple, one-shot, one-way transfer. Finally, it prolongs and deepens, rather than terminates, the court's involvement with the dispute." Id. at 1298.

Education and the Chancellor be held in contempt for their failure to comply with the duties they assumed under the consent decree and implementing orders of the court. The word "contempt" rings fiercely; if its connotations in law included only lay notions like scorn and wilful disobedience, plaintiffs could not prevail. But the idea in this context includes failures in meaningful respects to achieve substantial and diligent compliance. In this sufficient sense, the defendants are found to have been in contempt, and it has become the court's duty to declare it. The grounds and occasion of the declaration are detailed below. For reasons also to be stated, a prime practical consequence at the present time will be an award to plaintiffs of costs and attorneys' fees for their efforts in seeing to the performance of defendants' obligations.

I.

The case began in September of 1972. For most of two years, defendants opposed robustly the rights plaintiffs asserted to bilingual instruction. In 1974, however, the Supreme Court decided *Lau v. Nichols, supra,* and plaintiffs made an imposing motion for summary judgment. Thus confronted, and with some encouragement from this court, defendants joined with plaintiffs in the creative efforts that produced the consent decree. For their primary contributions to that result, plaintiffs were held entitled to attorneys' fees, 65 F.R.D. 541 (1975).

The decree provided for a broad program: for methods of identifying those to receive bilingual instruction, for specific forms of instruction in Spanish and English, for the formulation of pertinent educational standards, the preparation and distribution of instructional materials, the recruitment and training of staff, the procurement of suitable funding, continued consultation with plaintiffs, periodic reports, and an array of other measures unnecessary to detail now.

Time limitations at various points reflected the results of hard bargaining and compromise. It was recorded, for example, that the development of methods for testing and identifying participating students had already begun, "with the objective of implementation by October 1, 1974." Minimum educational standards were to be promulgated by April 1, 1975. While plaintiffs had sought greater speed, "full implementation of the Program" was put off for over a year, to September 1975. In the meantime, a timetable for still other steps, including the designation of pilot schools and their inauguration of the full program by the spring semester of 1975, was prescribed.

A Special Master, Morris P. Glushien, Esq., was appointed to resolve disputes that seemed likely to arise. Serving mostly without pay, Mr. Glushien has rendered valuable service to the parties, the court, and the City in adjudicating, or otherwise helping to resolve, a variety of matters. The court has been employed directly for similar and related assignments from time to time. See 394 F.Supp. 1161 (D.C.1975).[2]

In the spring and summer of 1975, plaintiffs proceeded by orders to show cause to press claims that defendants' performance under the decree was falling substantially short. In May, eight months after testing methods were to have been in place, they demanded administration of eligibility tests to huge numbers said still to have been neglected. In July, another order to show cause sought to prevent the discharge, layoff, or "excessing" of instructional personnel needed for the program. The court was confronted at that point with a failure by defendants to supply even sufficient information for an intelligent adjudication. Defendant Board was ordered, on August 15, 1975, to submit by August 25: "(a) the number of pupils, by school and school district, entitled to receive the Consent Decree Program as determined by the L.A.B. [Lan-

---

2. The supervisory duties of the court have entailed other aspects that are now of only tangential interest. Some Hispanic parents worried lest their children be compelled, over objection, to participate in the bilingual program; their concerns were resolved by allowing what is roughly called a right to "opt out," all implemented by suitable forms and procedures defendants evolved.

guage Assessment Battery] test results; (b) the number of Spanish speaking and Spanish surnamed pupils, by school and school district, who because of absence were not given all or any part of both the English and Spanish version of the L.A.B. tests; (c) the number of licensed bilingual teachers, the number of licensed teachers of English as a Second Language, and the number of teaching personnel in any other relevant job categories, by school and school district, who are currently included in the school's personnel staff and who will be available to provide the Consent Decree Program to children entitled to receive it in September, 1975; and (d) the number of licensed bilingual teachers and the number of licensed teachers of English as a Second Language who are available to provide the Consent Decree Program to children entitled to receive it in September, 1975, but who are not yet appointed."

On August 26, defendants supplied plaintiffs and the court with only some of the required information. The insufficiency, insufficiently explained, triggered talk and thoughts of possible contempt problems. In the event, however, on September 9 (when the picture was complicated by a teachers' strike, in progress since September 8, which ended on September 16), the court reiterated and expanded the earlier order for information by ordering as follows:

"1. Within ten days after the end of the teacher strike now in progress, or as promptly as may be possible before that, the defendants will supply the four categories of information which were to be supplied under the Court's order of August 15, 1975.

"2. On the same schedule, which is to say again as promptly as possible but, in any event, not later than ten days after the end of the strike the defendants will administer the English L.A.B. test and the Spanish L.A.B. test where those are respectively appropriate, that is to say, to all Hispanic pupils who have not heretofore been fully tested in these two respects as they are applicable to these students under the decree and subsequent orders of the Court.

"3. Again as promptly as possible but, in any event, within twenty days after the end of the teachers strike, the defendants will serve upon the plaintiffs and file with the Court the following three categories of information:

"(a) On a school-by-school basis, the total number of pupils eligible for the program, and that total should include, of course, those who were heretofore found to be eligible by the L.A.B. test and those found to be eligible as a result of the L.A.B. test to be administered in accordance with today's order.

"(b) On a school-by-school basis, the program designs for the supplying of the program for all pupils eligible within the respective schools.

"In that connection, the Court relies both on the good faith of the parties in making these requirements intelligible by their cooperative endeavors and understanding and on the conversation on today's record by which the meaning of that possibly cryptic phrase, 'program design,' should be sufficiently clear for implementation.

"(c) A list of pupils eligible for the program who are not in fact receiving the program because of personnel shortages or other difficulties, and the word 'list' should not be misunderstood. These names should again be supplied school by school so that they will be meaningful and usable.

"And then, in that same connection, a statement of the Board's proposals and intentions for the delivery of the program to such pupils as promptly as possible, whether that is to be done by the hiring of additional teachers, by the transportation of teachers or pupils between schools or other measures to be specified in the statement of information given in this respect by the defendants.

"Except to the extent just ordered, the plaintiffs' motion is denied, but that is, as the Court has today indicated, without prejudice to such later applications as the plaintiffs may deem necessary, although the Court reaffirms its expression of hope

that this complex problem can be mostly or wholly handled by cooperation and consultation, rather than further orders or sanctions of the Court."

On December 22, 1975, plaintiffs brought the present contempt proceeding alleging that defendants were in violation of the August 1974 consent decree and the August 15 and September 9, 1975, orders in the following respects: (1) defendants were not providing the program as required to thousands of entitled students; (2) defendants had failed to hire the necessary available personnel; (3) defendants were using unqualified personnel in the program; (4) defendants had failed to complete testing of the eligible population; and (5) defendants had failed to submit information required by the court's August 15 and September 9 orders. A reference was made to the Honorable Charles J. Hartenstine, Jr., as Special Master, to take evidence and report his findings and recommendations. After some 19 days of evidentiary hearings, but before there was time to report, all of us were stunned, for reasons far transcending any lawsuit, by the Magistrate's sudden and untimely death. The parties later agreed that the court should make its findings and conclusions upon the full and comprehensive record compiled by the Magistrate. This account and decision are the results.

█ Briefly stated, the court's ultimate findings of contempt are determinations that defendants violated their obligations under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals. The fact that goals were not achieved, or achieved only partially and tardily, is not in itself grounds for either criticizing the defendants or holding their conduct contumacious. The court is not empowered to command, any more than it can pretend for itself to achieve, performance approximating perfection. The court is obliged, however, to require substantial performance and due diligence. It is in these vital respects that today's decision must go against the de-

fendants. As will appear, they failed steadily and repeatedly to exercise their power and authority so that those they controlled would proceed promptly and in good faith to accomplish the tasks commanded by the consent decree. This failure reflected their own lack of concentrated will to achieve substantial compliance. In these central respects, plaintiffs have demonstrated that (a) defendants were seriously remiss, (b) this contempt proceeding was necessary and proper to remedy the defaults, and (c) plaintiffs and their counsel have made a valuable contribution by promoting in this fashion the organization and implementation of the bilingual education program required under the law.

II.

As was stated in the preceding paragraph, failure of timely performance is not found contumacious in itself. Nevertheless, it aids orderly understanding to have in view the respects (to a substantial extent undisputed) in which the goals of the decree have not been achieved or have been notably delayed.

It will be recalled that the decree, allowing over a year for this purpose, ordered "full implementation of the Program for all children * * * by September, 1975 * * *." The performance fell far short. While the precise figures covering the times in question are not known (a gap resulting from defendants' defaults in gathering and reporting the facts, as to which see *infra*), the largely agreed statistics are not inspiring.

In the elementary and junior high schools operated by the community districts, in late December 1975, over three months after the program was to be extended in full to everyone, the statistics compiled by the Board itself reveal that over half of the entitled students were enjoying no part of the program whatsoever. Broken down by community districts, the figures showed the following:

| DISTRICT | % NOT PARTICIPATING |
|----------|---------------------|
| 1 | 68 |
| 2 | 59 |
| 3 | 70 |
| 4 | 72 |
| 5 | 65 |
| 6 | 23 |
| 7 | 72 |
| 8 | 56 |
| 9 | 27 |
| 10 | 64 |
| 11 | 53 |
| 12 | 32 |
| 13 | 56 |
| 14 | 44 |
| 15 | 25 |
| 16 | 40 |
| 17 | 33 |
| 18 | 33 |
| 19 | 70 |
| 20 | 54 |
| 21 | 65 |
| 22 | 69 |
| 23 | 35 |
| 24 | 23 |
| 25 | 85 |
| 26 | 0 |
| 27 | 81 |
| 28 | 51 |
| 29 | 77 |
| 30 | 100 |
| 31 | 92 |
| 32 | 41 |

Even these figures overstate the degree of performance; those receiving only some, not all, elements of the Program were treated in those compilations as participating fully.

By February 1976, roughly six weeks after the initiation of this contempt action, new and more complete figures were compiled by the Office of Bilingual Education. In summary, those figures revealed that 38.6% of the eligible students were receiving all elements of the program, 37% were in receipt of some elements, and 24.4% were in receipt of no elements at that time. The final figures available to the court show that as of May 21, 1976, 74.7% of the eligible students were receiving all elements of the program, 18.4% were receiving some elements, and 6.9% were not participating at all.

For the high schools, the supplying of information was even more laggard though the last reported percentage of achievement seems somewhat better. The earliest figures were not compiled until January 1976. They showed as of then some 91% of eligible students receiving some or all of the program, but without revealing how many were receiving how much. Four months later, on May 10, the figures showed that roughly 79% of the eligible students were receiving all elements of the program, 10% were in receipt of some elements, and 11% were not participating at all.

The Division of Special Education, through its various bureaus, provides programs for pupils who are physically, mentally, or emotionally handicapped. The programs are under the jurisdiction of the Division, but are in some cases offered within community schools or high schools. While both plaintiffs and defendants have agreed that of the approximately 10,000 Spanish surnamed children in the special education program, some 2,600 are probably eligible for the consent decree program, only a very small number have actually been given any eligibility test and fewer still are receiving any elements of the program. Disagreements among Board of Education officials as to the usefulness or validity of the L.A.B. for special education children seem to have precluded the provision of substantial bilingual instruction in the Division. As of April 1, 1976, eligibility testing of Hispanic special education students still had not been completed.

Turning from the percentage figures of program availability, we consider the personnel requirements and the degree of performance in this respect. The decree requires, of course (decretal par. 7), that there be "an adequate staff for the purpose of implementing the Program." The staff needs are defined, and action to meet them (training, recruitment, licensing, etc.) is specified. Again, performance has fallen short, and this, as discussed below, is one of the clear aspects in which defendants have breached their duty of diligent performance. Viewing the City as a whole—which is the perspective corresponding with the scope of defendants' responsibilities—there

was by the fall of 1975 a sufficient number of qualified teachers to meet the personnel requirements of the program in the elementary schools.[3] There was a wide gap, however, between availability and placement. The community districts—responsible for hiring in the first instance, subject to the authority and decretal duties of the defendant Chancellor—failed in many cases to engage the bilingual teachers needed for effective implementation. In a number of schools, unqualified people were used in the program, contrary to the decree. The Chancellor and his subordinates knew of this situation throughout the school year 1975–76.

Inadequacies in meeting the personnel requirements were among the main causes of another deficiency—the failure to accomplish the necessary testing and eligibility determinations. Generally suitable tests for proficiency in English and Spanish were evolved with commendable speed (except for special education students, see *infra*), in time to ensure completion of testing by the end of the school year, thus facilitating implementation of the program by September 1975. However, the community school districts did not efficiently administer the tests or compile the results in a timely fashion. And so the deadlines were not met. As of August 26, 1975, 12 of the 32 districts and 51 of the 103 high schools had not yet submitted test results to the Office of Educational Evaluation. Even after the September 9 order of this court requiring, among other things, the submission of the results of L.A.B. testing, the Board of Education was unable to amass the needed information by the end of October.[4]

A portion of the eligible number not tested is accounted for by truancy and absenteeism, but this is a relatively small fraction. A larger factor—and one more significant in any case for present purposes—was

a lack of qualified bilingual personnel for administering the tests. In addition, delays were experienced, in both the spring and the fall of 1975, because defendant Board failed to make timely delivery of the test materials to the community districts.

To complete the present chapter, some further findings are noted on a subject already touched—the failure to comply with requirements of gathering and reporting information on the progress of the program. Some of the clearest failures of this nature followed the court's directives of August and September 1975 calling for information that would make it possible to gauge the extent of compliance. "Program designs," created to gather the data required by the order of September 9, were to be submitted by October 6, 1975. They were not. An extended deadline, October 24, was also missed. These essential monitoring devices—essential for plaintiffs, the court, and defendants themselves—were still missing in December for over 100 schools, and many of those submitted were incomplete. The requirement was not substantially met until March of this year.

Even the incomplete returns received by the Board were not processed promptly because of a lack of personnel. This personnel need was not met until late December 1975. The compilation and reporting of information improved after that.

### III.

We come to the regrettable but central point of today's decision—the grounds on which the delays and failures of performance must be attributed to defaults amounting to contempt on the part of the defendants.

 The governing principles of law are reasonably clear and largely undisputed. While a finding of civil contempt should

---

3. The issues concerning personnel seem to be confined to the elementary schools. The court finds, in any event, no comparable problems and ultimate defaults in the high school and special education classes.

4. Part of the delay in compliance with the September 9 order is attributable to the teachers' strike, subsequent layoffs, and school reorganizations. Much of it reflects, however, a long antecedent course of neglect in creating and enforcing effective means of reporting and general communication.

follow only from "clear and convincing proof," *N.L.R.B. v. Local 282, International Bro. of Teamsters, Etc.,* 428 F.2d 994, 1001–02 (2d Cir. 1970); *Hart, Schaffner & Marx v. Alexander's Dept. Stores, Inc.,* 341 F.2d 101 (2d Cir. 1965), the violation need not be wilful to evoke such a remedial determination. *N.L.R.B. v. Local 282, supra,* at 1001. Especially where the decree, as in this case, calls for elaborate and complex performance, a contempt adjudication is not required or justified merely because the results are found to be incomplete or postponed. It is a sufficient defense, to repeat language defendants quote, if a defendant official "has in good faith employed the utmost diligence in discharging his * * * responsibilities." *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App. D.C. 312, 510 F.2d 692, 713 (1975). Without necessarily insisting on the "utmost," this court has conceived the question to be whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered. *Washington Metro. A. Tr. Auth. v. Amal. Tr. Union, Etc.,* 174 U.S.App.D.C. 285, 531 F.2d 617, 621 (1976); *United States v. Swingline, Inc.,* 371 F.Supp. 37, 44–45 (E.D.N.Y.1974). It may be accepted that inability to comply would be a defense here, as it is in proceedings for criminal contempt, but defendants would be expected equally to show this "categorically and in detail," certainly not less where the obligations in question were accepted in a decree entered on consent. Cf. *United States v. Fleischman,* 339 U.S. 349, 362–63, 70 S.Ct. 739, 94 L.Ed. 906 (1950).

Upon the facts disclosed in this proceeding, defendants have fallen far short of the requisite diligence. They have neglected to marshal their own resources, assert their high authority, and demand the results needed from subordinate persons and agencies in order to effectuate the course of action required by the consent decree. They have allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs before even treating with the court concerning the delinquencies.[5] They have borne with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents, the community district boards. They have tolerated slipshod procedures. They have failed to enlist or order the placement of needed and available personnel. They have displayed an evident sense of nonurgency bordering on indifference, contrasting vividly with the spurt of activity on the heels of plaintiffs' motion for a finding of contempt.

The broad findings summarized in the preceding paragraph emerge from the particular circumstances accounting for omitted or delayed performance in specific aspects of the decree requirements. The serious failures in hiring and placing qualified personnel—failures concentrated in indolent or recalcitrant districts, contrasting with districts which proceeded swiftly to fill the staffing needs—comprise a prominent and basic chapter. As has been noted, adequate people were available by the fall of 1975 to staff the program. Responsible officials of the defendant Board had knowledge at the same time that many districts were neglecting to hire these available and necessary persons, and were subverting the program by employing unqualified people. Despite this awareness of a critical default, the Board's officials took none of the possible and effective actions that would have remedied it. They contented themselves for long and irretrievable months with "re-

---

**5.** Decretal par. 10 of the decree obligates defendants' counsel to notify plaintiffs' counsel "[i]n the event that there is a reasonable likelihood that full implementation pursuant to the Timetable will not take place by reason of insufficient funds, lack of personnel * * * or otherwise." Nevertheless, no notice was provided plaintiffs that the October 1 testing deadline would not be met, nor were plaintiffs informed that personnel problems threatened to delay implementation of the program and render the September 1975 deadline impossible to meet. Instead, in both cases, plaintiffs ultimately were forced to seek the court's assistance through the mechanism of show cause orders filed in May and July 1975 to discover the causes of the delay.

minders" to district officials of what was required to be done. Finally, early in December 1975, the Executive Administrator of the Office of Bilingual Education ("O.B.E.") and the Executive Director of the Office of Personnel agreed with the Chancellor's Special Assistant that the muscle of the Chancellor would be necessary to generate the required actions. Belatedly informed of the deplorable situation (having failed to see that he was more timely advised) in late December, the Chancellor remained passive, or at least ineffectual. The personnel deficiencies remained incompletely cured to the end of the 1975–76 school year.

In addition to the failure to take command and order compliance, defendants neglected to create effective procedures for the filling of personnel needs. The identification of personnel requirements was for the O.B.E.; the filling of places was for the Office of Personnel. The need for coordination was, or should have been, patent. There was no effective coordination, almost no genuine effort to coordinate. O.B.E. lacked any regular procedure for communicating personnel needs to the Office of Personnel. When the latter office sent available teachers to a district, no arrangement existed to tell O.B.E. if they were hired, or if not why not. The elementary idea of some follow-up mechanism was not perceived—or, if perceived, not implemented—until December 1975.

As has also been mentioned, the bumbling with respect to personnel was a critical element in the failures to administer the language assessment tests required by the decree. Insufficiently staffed districts were permitted in a number of cases to rest in the erroneous and stultifying belief that qualified personnel were not to be hired until after testing disclosed the number of students eligible for the program. Simultaneously, testing was delayed for lack of qualified personnel. Defendants knew or should have known of these obstructions, but failed to remove them.

The shortages of testing materials resulting from delayed or misdirected deliveries was another example of inexcusable neglect. Again, defendants or their responsible subordinates knew the facts. What was lacking was the concern and vigor necessary to remedy the defects. In September 1975, almost a year after all the children were to have been tested if at all possible under the decree (and at least many months after that goal should have been achieved), a community superintendent wrote to the Chancellor about difficulties in complying with the order of September 9, 1975. The Chancellor expressed sympathy about delayed materials, told of the part played by a truck accident, and complained that "the court provided little opportunity to gear up for this massive testing program." The note of uncomprehending plaintiveness scarcely reflects a resolute determination to accomplish consent decree goals unchanged since their formulation over a year earlier.

A nearly total failure to meet the testing requirement with respect to special education children is likewise attributable to defendants' neglect. In April 1975 it was known that the L.A.B. would not serve for some of these students. But it was not earlier than October 1975 when sustained efforts began to develop alternatives. This inexcusable delay was among the reasons why as late as April 1, 1976, the testing of Hispanic special education students remained incomplete. And even the tardy performance in this respect seems to have been attributable in some measure to a specific request by plaintiffs' counsel in the fall of 1975 for information about the state of special education testing.

If anything was clear from the outset, it was that performance at the operating level would be in large measure the work of community district personnel, and that defendants' compliance or default would turn in this sense upon what was happening in the community districts. It was manifest, therefore, that defendants would have a vital need to keep currently informed and, therefore, to have effective means of receiving information. As has been noted already, this was another major instance of laxity and inattention. At the beginning of

the 1975 school year, the information gaps became apparent to the parties and the court. It was late in September before the community superintendents were told what was wanted. There was no follow-up and no sustained pressure to exact compliance. This lack of effective supervision accounts for the fact that the requirements of information under the August and September orders remained unfulfilled three months later.

Similar inattention led to inadequate processing of the information as it was tardily received. The personnel deficiencies for this purpose have also been mentioned. Like other inadequacies, they were known to responsible Board officials, and remediable by them, long before corrective steps were taken. Again, the delay is neither justified nor excusable.

Further delay and inadequate planning infected the efforts of Board officials to establish a transfer program for students in schools where the small number of eligible students made it infeasible to install the program. As early as December 6, 1974, it was apparent to the Chancellor that transfer procedures would be necessary, and by the spring of 1975, the magnitude of the problem became evident. Nevertheless, not until February 1976 was a uniform transfer letter distributed citywide explaining to parents how the system would operate and seeking their permission for their children to participate. It took roughly three months for the various revised drafts of the letter to be approved and disseminated. As a consequence, those students who had to be transferred in order to receive the program were denied the opportunity to participate until sometime after February 1976.

The failure of supervision and control extended to extravagantly long and benign tolerance of outright defiance as well as foot-dragging and evasion in the districts. The uneven rates of compliance as among the several districts could have been, should have been, and actually were vivid evidence that a number of districts were guilty of obstruction at worst and neglect at best. Nobody doubted at any time the Chancellor's powers to compel performance, including the ultimate power to supersede a district if necessary. But these powers lay largely dormant for months. No district was even threatened with supersession until December 29, 1975. District 30, an open and thorough violator, was finally superseded on February 5, 1976.[6] Short of this most dramatic remedy, the Chancellor and his staff persistently neglected to use their powers of persuasion and coercion.

While the subject is quite different, plaintiffs are on sound ground when they contrast the force and urgency with which the Chancellor controlled the districts in complying with a collectively bargained obligation. There was an order in that connection to shorten the school day. A stream of implementing directives went to the community school boards. The Chancellor kept himself closely and directly informed. Twelve boards, seemingly laggard, were threatened with supersession within 1½ months of the initial order. After numerous personal meetings, the Chancellor superseded five.

The comparative lethargy in managing performance under the consent decree was the subject of aptly rueful comment by the O.B.E. Executive Administrator. Reporting on a delayed, truncated, and obviously ineffectual meeting with subordinate personnel of one community district, and noting the failure as late as January 1976 to get straight the facts as to "the degree of compliance with the consent decree," he wrote to the Executive Director of the Division of Educational Planning and Support:

" * * * I believe that this is a typical example of what we will be coming across in many districts. In other words superintendents have not been dealing directly with the details of the implementation of the consent degree program and have relied on casual information from

---

6. Attempts to enjoin that action—one transferred to this court, a second instituted here—were promptly defeated.

their staff. Even our letters addressed directly to the superintendents have usually been passed on to someone else to handle, but apparently without the sense of urgency and seriousness that is required. Now that they have received the Chancellor's letters they are claiming that either there is a discrepancy in the information or that they had never been forewarned. Both claims are unfounded and simply reveal a failure in the school districts to give this matter the priority it demands. Unfortunately, this attitude in the districts may be related to a weakness in our strategy at Central Headquarters in undertaking the implementation of the consent decree. I consider this weakness to be the apparent inability of anyone at Central Headquarters to meet for any extended period of time with all the community superintendents to discuss the consent decree. Since September of this year we have never discussed the consent decree with all of the superintendents for more than 15 minutes. This occurred at the last superintendents' meeting when the topic was supposed to have been discussed by the Chancellor and as you know he was not able to attend because of a tragic personal reason. You and I attended the meeting for a considerable length of time and the topic was never reached. I understand that shortly after I left, at approximately 11:45 A.M., the topic was presented briefly by Mr. Hart and the only feedback I have received regarding the nature of the discussion was that Mr. Hart reminded the superintendents that if they wanted to know what were the areas of non-compliance in their specific district they could contact our office. The budget crisis and the strike were obviously very significant factors requiring highest priority in everyone's mind and I would agree with this position. However, it is also clear to me that we have been guilty of neglecting a basic link in communicating the seriousness and urgency of our efforts to comply with a court order. There is no question in my mind that a number of problems could have been minimized had there been an opportunity to discuss the consent decree at length with all of the superintendents. I am now recommending that such a meeting be called by the Chancellor to include the participation of Central Headquarters' staff that is most intimately involved with this matter."

These observations were made when the instant contempt proceedings were already in progress. They were sound. Defendants, in a misconceived evidentiary objection before the Magistrate and again in their proposals as to fact findings, stress that Mr. LaFontaine's recommendations were "rejected." Far from being a useful argument, that is a confession of defendants' fundamental failure.

While the laxity continued into the present calendar year, it should also be said that the institution of the contempt proceedings triggered a notable access of attention and energy. This is to defendants' credit. It is also evidence, however, supportive of plaintiffs' position that defendants' contrasting inattention before these proceedings was unjustified.

The order to show cause was served on December 22, 1975. On the following day, the Chancellor convened a meeting of his staff to discuss the contempt charges and to devise a plan for notifying the districts of the immediate need for full compliance with the decree. It was decided that letters should be sent indicating to each district its present level of compliance and mandating, under the threat of supersession, that "all necessary corrective steps" be taken immediately to bring the district into compliance with the minimum educational standards promulgated by the Chancellor. These letters, the first the Chancellor sent to the districts specifically urging them to take immediate steps to comply with the decree and the first threatening supersession, were sent on December 29, 1975.[7]

---

7. On prior occasions, the Chancellor sent several memoranda to the community school districts regarding minimum educational standards (July 21, 1975), personnel policies (July 7, 1975), and opting out and transfer procedures (September 9, 1975). These communica-

At the same meeting, the Chancellor directed Mr. LaFontaine and O.B.E. to step up the pace of monitoring implementation and ordered that additional staff be assigned to expedite the processing of the program design forms which were to have contained the information ordered by the court some three months earlier. Although Mr. LaFontaine had pressed before for additional staff, it was not until this meeting that the need was satisfied. The Chancellor also expressed his view that it would be inappropriate for program specialists in O.B.E. to take vacations while efforts were being made to monitor implementation.

One outgrowth of the stepped-up monitoring process was the preparation of summary compliance reports in February 1976, after program specialists from O.B.E. had met with representatives of the community school districts to discuss the state of compliance. Such summary reports were prepared at the Chancellor's request to make sure that the information possessed by his staff corresponded with the records of the individual districts.

The show cause order also galvanized the Chancellor into action against the most blatantly defiant of the community districts. District 30 had been in substantially total and open violation of the decree through all the months after its issuance. But it was not until December 29, 1975, that the Chancellor threatened the long overdue measure of supersession. The threat, as noted earlier, was finally carried out on February 5, 1976.

The dramatic increase in attention and sense of urgency after the contempt charge accounts in large measure for the gratifying improvement in compliance statistics during the first half of the current calendar year. Plaintiffs' motion for a contempt adjudication, climaxing a steady course of pressure before that, must be acknowledged as a major cause of the change. Defendants must bear major responsibility for the prior history of delayed and defective performance.

## IV.

In concluding that defendants must be found delinquent, the court has not overlooked the obstacles and problems with which they have had to contend. They work in a City beset with social and financial travails of awesome dimensions. The personal and political stresses of a "federalized" public school system—the contests of will and prestige between a central Board and the community districts—cannot be ignored and must not be underestimated by a relatively cloistered court. There was a teachers' strike lasting from September 8 to 16, 1975. Absences, truancies, family moves, parental ignorance and resistance, staff inertia—all manner of impediments drained the defendants' own energies and those they could marshal for obedience to the decree. In stressing that perfection in compliance is not the standard, the court has reckoned long and soberly with the mammoth, complex, sprawling, and often unruly domain for which defendants are responsible.

When the balance has been struck, however, weighing all of defendants' problems, it comes down decisively for the plaintiffs. While tightened budgets have given persistent trouble throughout the system, there is no clear claim, and no basis for a claim, that shortages of money account for or justify the defaults on which today's decision against defendants is rested.[8] Both at the time of the events and in reaching today's decision, the court has made allowances for

tions were essentially required either directly or indirectly by the consent decree and subsequent court decisions, and did not serve as thorough or overall commands to obey the decree promptly.

8. The problem of money has been in view throughout. The decree (par. 10) says: "In the event defendants' good faith efforts fail to generate sufficient funds to implement this Program pursuant to the Timetable, defendants shall be required to show good cause to this Court why sufficient funds are unavailable * * *." No such showing has ever been made. None is made now.

Similar observations under paragraph 10 apply to supposed problems in mustering personnel to administer the program.

the problems of the teachers' strike, the subsequent shortening of the school day, and the attendant reorganization of class schedules and teacher assignments. These, along with the rest of defendants' undoubted difficulties, fail to defeat the charges of inattention, lethargy, and drift which are the central ones resolved adversely to defendants.

The issue of decentralization is in many respects at the heart of this proceeding. The record shows that the problem of noncompliance was to a significant degree concentrated in the community school districts, not in the high schools over which the Chancellor and the Board of Education had more direct control. The Chancellor has never suggested that he lacks the authority to implement the consent decree in the community school districts, and the promulgation of the minimum educational standards in July 1975 was designed to insure such authority. Consequently, the decentralization of the schools cannot excuse noncompliance; instead, it highlights the need for vigorous leadership and sustained communications between the Board of Education and community school administrators if the program is to be successfully implemented. These proceedings reveal that, to a large degree, the Board has not come to grips effectively with the necessity of overseeing and controlling the decentralized districts. Such oversight and control are critical in the implementation process, and their absence for too long is, as the court reiterates, a principal ground of today's decision.[9]

## V.

Plaintiffs seek various forms of immediate and contingent relief. The remedies for which they pray would:

(1) Declare that defendants have been guilty of contempt.

(2) Order defendants to purge themselves by complying from now on with the decree and orders of August 15 and September 9, 1975.

(3) Provide for a receiver if defendants do not purge themselves.

(4) Grant plaintiffs' costs and attorneys' fees.

The declaration of contempt has been made and may be embodied in an order of this court.

The demand that defendants "purge themselves" embraces a proposal that they "be enjoined from terminating the employment of and ordered to hire necessary staff to implement the program as required * * *." These broad expressions would seem to reflect what the decree presumably commands; the retention of "necessary staff" is among the things defendants must ensure "to implement the program as required * * *." If the language means more than the decree already requires, its purport and justification are not apparent. Accordingly, since the decree remains in full force and effect according to its original terms, the newly phrased command will not be given.

It is also said that some eligible students for whom the program was not available in September 1975 declined to change classes in mid-semester "and were, in effect, forced to opt out * * *." The court notes this asserted grievance, but finds no need to make it the occasion of any special direction at this time. No student otherwise eligible should be permanently excluded because he or she may in some sense have "opted out" at some time. It is to be expected that all parties will construe and apply the decree accordingly.

With respect to the heady, but conceivable, thought of a receiver, no action by the court is requested or necessary at this time.

■ Finally, the prayer for costs and attorneys' fees should and will be granted.

---

9. Defendants insist vigorously that they are *now* in compliance and that a finding of contempt would therefore be impermissibly "punitive." Assuming there is total compliance at this time, the conclusion would not follow. Defendants were in contempt for a long time, extending to and after the institution of this proceeding. Today's adjudication is appropriate not merely to record the violations and to compensate plaintiffs for their corrective endeavors, but to underscore the importance of avoiding similar disobedience in the future.

This compensatory remedy is plaintiffs' due in these successful contempt proceedings, both as a matter of common law, *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 665 n. 5 (2d Cir. 1970), and, as the court has held earlier in this case, 65 F.R.D. 541 (1975), under § 718 of Title VII, Emergency School Aid Act of 1972, 20 U.S.C. § 1617. The award will cover costs and fees incurred in the contempt proceedings and in the closely interrelated proceedings, beginning with the orders to show cause, dated May 29, 1975, and July 8, 1975, respectively, leading to the court's orders of August 15 and September 9, 1975. Other recoveries for other efforts will be denied.[10]

The award of costs and attorneys' fees is not a "sanction" or a "punishment" in any worthwhile sense of these terms. Defendants, together with plaintiffs and all others in a great City, have a shared interest in the effective vindication of federal rights for public school students. As defendants point out, the City has invested large sums for this purpose, and will continue to do so. Plaintiffs and their counsel, though the format is adversary pressure, have contributed greatly to the pursuit of shared goals. As the Supreme Court has taught us:

> " * * * With the Board responsible for the education of the very students who brought suit against it to require that such education comport with constitutional standards, it is not appropriate to view the parties as engaged in a routine private lawsuit. In this litigation the plaintiffs may be recognized as having rendered substantial service both to the Board itself, by bringing it into compliance with its constitutional mandate, and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system."

*Bradley v. Richmond School Board,* 416 U.S. 696, 718, 94 S.Ct. 2006, 2019, 40 L.Ed.2d 476 (1974).

It is to be hoped that the parties can proceed in this light, as they were able, commendably, to do before, and agree to a suitable amount for costs and attorneys' fees. If that effort fails, the court will resolve the problem.

An order should be settled embodying the foregoing determinations and leaving the amount of costs and attorneys' fees to abide further events.

---

**10.** As has been mentioned, plaintiffs have been busy in other proceedings under the decree both before the court and before Special Master Glushien. Those efforts have had mixed results; the degree to which plaintiffs have "succeeded" and the degree to which they have burdened defendants with arguably unnecessary quarrels are matters that were not timely presented in the past and have not been canvassed in the contempt proceedings. There is not sufficient record or demonstrated legal basis for additional awards for those activities.