Terri Lee HALDERMAN et al., Plaintiffs,

v.

PENNHURST STATE SCHOOL AND HOSPITAL et al., Defendants,

United States of America, Plaintiff-Intervenor,

Pennsylvania Association for Retarded Citizens et al., Plaintiffs-Intervenors.

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

Sept. 11, 1981.

David Ferleger, Philadelphia, Pa., 19103 for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., 19109 for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., 17120 for the Commonwealth of Pennsylvania.

Thomas Gilhool, Esq., Public Interest Law Center, Philadelphia, Pa., 19107 for Pennsylvania Association for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., 19103 for David Ferleger, Esq.

Pamela P. Cohen, Esq., Philadelphia, Pa., 19103 for Pennhurst Parents Association.

Adjor A. Burrow, Civil Rights Division, Dept. of Justice, Washington, D. C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., 19401 for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., 19107 for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Commencing on July 23, 1981, this Court held a hearing on a Rule to Show Cause why the Commonwealth defendants and Bucks, Delaware, Montgomery and Philadelphia Counties should not be held in civil contempt for their failure to comply with Paragraph 1 of this Court's Order of March 2, 1981.

Paragraph 1 of the Court's Order of March 2, 1981 provides:

Defendants shall provide community living arrangements with all the services required by the retarded person's Individual Habilitation Plan for at least 61 Pennhurst residents (not covered by the School-Age Order)—8 from Bucks County, 11 from Chester County, 9 from Delaware County, 15 from Montgomery County, and 18 from Philadelphia County—and for at least 29 other retarded persons in the Southeast Region of Pennsylvania including members of the plaintiff class during the period commencing with the date of this Order and closing June 30, 1981.

The Court issued this specific implementation order because by March 2, 1981 the movement of Pennhurst residents to appropriate community living arrangements had almost come to a standstill, despite the fact that on March 17, 1978 the defendants were ordered to provide adequate community living arrangements and services for all the residents of Pennhurst and the other retarded members of the plaintiff class.

This case, which began in 1974, was tried before the Court, sitting without a jury, over a period of 32 days, ending on June 13, 1977. At the trial all the parties, including the defendants, agreed that institutions like Pennhurst were inappropriate and inadequate for habilitation of mentally retarded persons, and that the retarded should be educated, trained, and cared for in normalizing community settings. The defendants did not dispute this view, but insisted that they wished to accomplish the community placement of Pennhurst residents pursuant to their own schedule, which the Court found to be vague and indefinite. On December 23, 1977, this Court, 446 F.Supp. 1295, issued its findings of fact and conclusions of law in which it found that

the defendants were violating the constitutional and statutory rights of the members of the plaintiff class by failing to provide them with minimally adequate habilitation in the least restrictive environment. By "adequate habilitation" is meant such education, training, and care as will enable a retarded person to cope with life as effectively as his or her capacities will permit. As the trial record in this case reveals, all parties to this litigation admitted that the residents of Pennhurst were not receiving minimally adequate habilitation. The average stay of a resident at Pennhurst is 21 years, and the testimony showed that a majority of them had regressed in that their level of functioning had declined when compared to the skills which they possessed at the time of admittance to Pennhurst. On many occasions since the trial, all parties have agreed with the many experts who testified at the trial that normalization is now universally accepted as the method of habilitating a retarded person. Normalization is the antithesis of institutionalization and is based upon the fact that the education, training and care of a retarded person can only be accomplished in a community living arrangement. This Court found that Pennhurst as an institution is inappropriate and inadequate as a place to habilitate the retarded. At the trial, the Commonwealth represented that it intended to close Pennhurst in the early 1980's.

On January 6, 1978, this Court held a further hearing for the purpose of determining the relief which should be granted. The parties were asked to attempt to reach an agreement on the appropriate relief. When the parties informed the Court that they could not agree on an order, the Court requested that they submit separate proposed orders. Finally, on March 17, 1978, the Court issued an Order, 446 F.Supp. 1295 at 1326 directing the County and Commonwealth defendants to provide adequate community living arrangements and services for all residents of Pennhurst and the other retarded members of the plaintiff class. This Court further ordered that an individual habilitation plan must be developed for each member of the plaintiff class, that appropriate community monitoring mechanisms be designed and implemented, and that a Special Master be appointed to monitor defendants' planning and implementation activities.

The defendants appealed and on December 13, 1979, the Court of Appeals issued an Order substantially affirming this Court's Order of March 17, 1978, and remanding the matter to this Court for further proceedings. *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84. The Third Circuit sitting *en banc* upheld this Court's "determination that, for the retarded class members as a whole, Pennhurst cannot be an appropriate setting in which to provide habilitation," (612 F.2d at 114), but remanded the case for individual determinations by the Court or a master concerning the appropriate placement for each Pennhurst resident. The Third Circuit stated that such individual determinations should be guided by a presumption in favor of a community living arrangement. (612 F.2d at 115).

In light of the Third Circuit's opinion, this Court, on April 24, 1980, issued an Order incorporating and amending its prior Orders, including the Order of March 17, 1978. The April 24, 1980 Order provided for the continuation of the individual planning and assessment process, with full participation by the Pennhurst resident, family, and advocates, established in prior Orders of this Court. The Court also established an impartial hearing procedure and appointed a Hearing Master to provide an individual hearing for any resident of Pennhurst who claims that the living arrangements and services available at Pennhurst are more beneficial to habilitation than those made available in the community.

The United States Supreme Court granted *certiorari* in this case on June 9, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), and on June 30, 1980 entered a stay order pending final disposition, *Pennhurst State School and Hospital v. Halderman*, 448 U.S. 905, 100 S.Ct. 3046, 65 L.Ed.2d 1135 (1980), *Pennhurst Parents-Staff Association v. Halderman*, 448 U.S. 905, 100 S.Ct. 3047, 65 L.Ed.2d 1135 (1980). The Supreme Court's stay order limits transfers from

Pennhurst to those retarded residents of Pennhurst whose transfer is "voluntary." On July 14, 1980, this Court ordered the Hearing Master to hold a hearing for each Pennhurst resident for whom a community living arrangement has been prepared, for the purpose of determining whether the proposed transfer from Pennhurst to the community is "voluntary." On December 1, 1980, the Supreme Court declined to disturb this Court's interpretation of its limited stay order.

In March, 1978, when this Court issued its initial remedial Order, the population of Pennhurst was 1,156. Despite this Court's Orders, and despite the representations by the defendants of their intentions to comply with this Court's Orders, the retarded population of Pennhurst had been reduced by only 184, to a total of 972, as of the end of August, 1980—and not all of that reduction was due to the transfer of Pennhurst residents to community living arrangements. The school-age residents of Pennhurst, the subject of two specific Court Orders, had not all been placed in the community by an extended deadline of June 30, 1980, and indeed not all have been transferred even as of the present date. That only 122 Pennhurst residents had been transferred to community living arrangements in the more than two years since this Court's original Order of March 17, 1978, up to the end of August, 1980, necessitated the issuance of the Order of March 2, 1981.

In the spring of 1980, when the Court learned that the pace of community placements was more sluggish than in the previous year, it scheduled a hearing on May 27, 1980, at which defendants were directed to show cause why the Court should not adopt the implementation order proposed by the Court. In conference with this Court in chambers prior to the May 27, 1980 hearing the Commonwealth expressed its intention to fully comply with this Court's Orders to provide community placements for the persons in the plaintiff class. The Commonwealth, however, at those conferences took the position that it preferred to accomplish this without intervention from the Special Master's Office and pursuant to its own timetable which it presented to the Court.

The Commonwealth's timetable, which is attached to the Court's Memorandum of March 2, 1981 as Appendix A, provided that 150 Pennhurst residents and 100 other retarded persons would be placed in community living arrangements in the Southeast Region of Pennsylvania during the 1980–81 fiscal year. On the basis of these commitments which were reiterated by the Commonwealth defendants at the May 27, 1980 hearing, the Court delayed issuing an Order so that the defendants would have their opportunity to proceed on the basis of their own commitment. However, the commitment of the Commonwealth defendants was not fulfilled, in that only four Pennhurst residents were placed in community living arrangements in the Southeast Region from the start of the 1980–81 fiscal year on July 1, 1980 to March 2, 1981. Therefore, the Court on March 2, 1981 issued a specific implementation order. In formulating the specific implementation order of March 2, 1981, the Court arrived at the number of Pennhurst residents to be placed in the community on the basis of the Commonwealth's letters of fund allocation to the defendant Counties for the fiscal year ending June 30, 1981. These letters made provision for less than half the number of placements proposed to the Court in May, 1980 (111, as opposed to 250). The requirements of Paragraph 1 of the Order of March 2, 1981, were determined by the Court to be well within the capabilities of the defendants.

It was evident that if the goals of the Court's original Order were to be realized, and if the numerical requirements imposed by the March 2, 1981 Order were to be accomplished, the defendants should be required to immediately undertake the planning necessary to comply with the March 2, 1981 Order. The Order required that the defendants submit detailed and meaningful implementation plans to the Court. Paragraph 4 of the March 2, 1981 Order provides:

> Within 20 days of the date of this Order, the Commonwealth and County defendants shall each prepare and submit to this Court specific plans (including but

418

not limited to timetables, identification of the retarded persons for whom community living arrangements and services will be provided, and arrangements being made to obtain appropriate providers for residential, programmatic, and support services) for complying with paragraph 1 of this Order.

The Court warned in its Memorandum of March 2, 1981, that in the event of an unacceptable failure to comply with the Court's Order of March 2, 1981, it would become necessary to consider contempt proceedings. The Court stated in its Memorandum of March 2, 1981 that although reluctant to consider contempt proceedings, it could not permit the defendants to continue their failure to provide the residents of Pennhurst with adequate habilitation in the least restrictive environment.

Defendants filed motions to amend, alter and/or stay this Court's Order of March 2, 1981. However, without providing the Court with an opportunity to rule on its motion, the defendants advised this Court on April 16, 1981 that they had filed an application for a stay with the Court of Appeals. The Court of Appeals denied defendants' motion to stay the Order on May 26, 1981. At a conference in chambers on May 28, 1981, the Court asked the defendants whether they wished to proceed with their motions to alter or amend and they stated that they did not wish to pursue the motions at that time.

■ The validity *vel non* of this Court's Order of March 2, 1981, is not a defense to failure to obey the Order in that a Court's Order may not be attacked collaterally in a contempt proceeding. *Pasadena City Board of Education*, 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976); *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971).

On July 1, 1981, the plaintiffs filed a motion for a finding of contempt alleging that the defendants (with the exception of Chester County) had not complied with the Order of March 2, 1981.

On July 7, 1981, the Court issued an Order to show cause why the Commonwealth defendants and Bucks, Delaware, Montgomery and Philadelphia Counties should not be held in civil contempt for their failure to comply with Paragraph 1 of this Court's Order of March 2, 1981. A hearing was held on July 23 and 24, and August 4, 11, and 12, 1981. Philadelphia County on August 11, 1981 entered into a consent order agreeing to place its 18 Pennhurst residents in community living arrangements on or before September 30, 1981. The consent order of Philadelphia County also provides for the payment of attorneys' fees to counsel for the plaintiffs. The Court therefore will limit its findings of fact and conclusions of law to the Commonwealth defendants and the Bucks, Delaware and Montgomery County defendants.

Paragraph 1 of the Court's Order of March 2, 1981 is clear. It required the defendants to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for 61 Pennhurst residents —8 from Bucks County, 11 from Chester County, 9 from Delaware County, 15 from Montgomery County, and 18 from Philadelphia County—and for at least 29 other retarded persons in the Southeast Region of Pennsylvania including members of the plaintiff class by June 30, 1981. Evidence in this proceeding, which was uncontradicted, shows that on June 30, 1981, the date specified in the Court's Order, only *6* of the *61* Pennhurst residents had been moved from Pennhurst into a community living arrangement pursuant to the Court's Order. However, on August 13, 1981, within 24 hours after the hearing on the contempt motion was completed, the Bucks, Delaware and Montgomery County defendants had substantially complied with the Order. As a result of a great burst of activity, the Bucks, Delaware and Montgomery County defendants (Philadelphia County entered into a consent order and Chester County was not cited for contempt) were able to achieve on or before August 13, 1981, compliance with the Order as follows:

> *Bucks County* : 7 of 8 Pennhurst residents were moved to a community living arrangement.

*Delaware County*: 7 of 9 Pennhurst residents were about to be moved to a community living arrangement.

*Montgomery County*: 14 of 15 Pennhurst residents were moved to a community living arrangement.

### The Commonwealth Defendants

Dr. Jennifer Howse, the Deputy Secretary for Mental Retardation, is a dedicated professional in the field of mental retardation. She has had extensive experience in the development, implementation, and monitoring of community placement programs for retarded residents of institutions who have been moved to community living arrangements. (N.T. 3–19). In her many appearances before this Court, Dr. Howse has exhibited a commitment to the basic thrust of this Court's Orders, *i. e.*, that the education, training and care of retarded persons should be accomplished in community living arrangements. She became aware of the March 2 Order on the day it was issued and began planning for its implementation. In the days immediately following she met with her staff to determine "how the Commonwealth might best proceed to work cooperatively with the counties and provide leadership, support, and give direction" for the implementation of the Court's March 2 Order. (N.T. 3–20).

Dr. Howse met separately on March 10, 1981, with the mental retardation administrators of Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties. She requested the Counties to bring to the meeting a preliminary assessment of how many placements each County could make with existing resources and how much in additional funds, if any, the County would need to fulfill the requirements of the Court's order. She advised the Counties that they "should leave no stone unturned with respect to the expeditious, thorough and professional implementation of Judge Broderick's March 2nd Order." (N.T. 3–24).

Dr. Howse requested all the Counties to complete their proposals and submit them by March 19, 1981. Chester, Bucks and Delaware Counties stated they would need additional funds to make the placements ordered by the Court. Dr. Howse directed her fiscal officer to determine whether the additional funding requested by the Counties was available, and $168,790 in additional funds was made available: $65,313 to Chester County, $19,528 to Bucks County, and $83,949 to Delaware County. (N.T. 3–4; Com. Exh. 3). The Department of Public Welfare made another $82,219 in additional funds available to Delaware County to resolve deficits in its ongoing programs. (N.T. 3–40).

The plans prepared by the Counties were reviewed and analyzed by Dr. Howse and her staff, and incorporated into a plan submitted to the Court on March 25, 1981. (N.T. 3–34—3–36). The Commonwealth undertook the responsibility of providing funds to the Counties sufficient to provide the community services and community facilities to meet the requirements of the Court's Order.

The plan which the defendants filed with this Court on March 25, 1981 proposed 98 total placements, 8 more than the 90 required by the Court's Order. This plan provided for the transfer of 64 Pennhurst residents to the community, 3 more than required by Court's Order. It also provided for the placement of 34 other retarded persons in community living arrangements, 5 more than required by the Court's Order. Dr. Howse testified that this was done in order to provide a cushion against unforeseen problems that might arise. (N.T. 3–42).

Dr. Howse met individually with the Counties on 2 additional occasions to review their progress and discuss their problems. (N.T. 3–45). The Commonwealth continued to monitor the activities of the Counties in making the required placements. The Commonwealth also prepared "tracking reports" every 2 weeks beginning April 15, 1981. (N.T. 3–171; Com. Exh. 3). The purpose of the reports was "to measure where each county stood in respect to each individual client ... in concise terms how far the county has gone and how far they have to go." (N.T. 3–173). The Court finds that the Commonwealth defendants substantially complied with Paragraph 1 of this

Court's Order of March 2, 1981, in that they acted diligently and with steadfast purpose to effectuate the Court's Order.

*Bucks County Defendants*

Paragraph 1 of the Court's Order of March 2, 1981 required that 8 Pennhurst residents from Bucks County should be moved to community living arrangements with all the services required by the retarded person's individual habilitation plan by June 30, 1981. The defendants' March 25, 1981 plan submitted to the Court identified 8 Pennhurst residents and 8 other retarded persons to be provided with community living arrangements and services by Bucks County pursuant to Paragraph 1 of the March 2 Order. The Commonwealth made available to Bucks County the additional sum of $19,528 in order to accomplish these placements.

Seven of the 8 Pennhurst residents from Bucks County identified for placement in the March 25, 1981 plan had been previously identified for transfer from Pennhurst on several occasions as early as June 29, 1978. (P. Exh. 5, Dep. pages 99–101, 111–13, 115–18, 119–31). All 8 were identified for transfer by October, 1980. As of June 30, 1981, the date specified in the Order, only 1 of the 8 Pennhurst residents had been moved into a community living arrangement. None of the 8 had their individual habilitation plan approved by the Special Master, and none of the 8 had appeared before the Hearing Master for a hearing as to whether their transfer from Pennhurst was "voluntary" as required by this Court's Order made pursuant to the stay granted by the United States Supreme Court.

All contract proposals for the 6 eventual providers of the community living arrangements for the 8 residents of Pennhurst were submitted by mid-April 1981. (N.T. Aug. 11, 1981 at 62–65). However, it was not until June 9, 1981, 3 months and 6 days after the March 2 Order, that Bucks County advised the Commonwealth that the County was having difficulty in finding an appropriate community living arrangement for 3 of the 8 residents of Pennhurst. (P. Exh. 5, Bucks County Dep. Exh. 5A). Bucks County had known since June 29, 1978 that these 3 Pennhurst residents were "non-ambulatory" and therefore required special facilities. These 3 non-ambulatory residents of Pennhurst had been identified by Bucks County as priority candidates for placement in October 1980. (P. Exh. 5, Bucks County Depo. Exh. 11).

The Court finds that as of June 30, 1981, the Bucks County defendants were not in substantial compliance with Paragraph 1 of the Order of March 2, 1981 in that they violated their obligation to act diligently and with a steadfast purpose to comply with the Court's Order. However, the evidence shows that on August 10, 1981, 7 of the 8 Pennhurst residents from Bucks County identified for placement pursuant to Paragraph 1 of the March 2 Order had moved from Pennhurst to a community living arrangement and that the one remaining at Pennhurst was too ill to be moved.

*Delaware County Defendants*

Under the Order of March 2, 1981, Delaware County defendants were required to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for 9 residents of Pennhurst on or before June 30, 1981. The defendants' March 25, 1981 plan submitted to the Court identified 9 Pennhurst residents and 6 other retarded persons for community placement. The Commonwealth made available to Delaware County an additional sum of $83,949 to accomplish these placements. The Commonwealth also made available an additional $82,219 to resolve deficits in Delaware County's ongoing programs for the mentally retarded.

As of June 30, 1981, not one of the 9 Pennhurst residents identified by Delaware County for transfer from Pennhurst had been moved into a community living arrangement. (N.T. Aug. 11, 1981, at 137).

Delaware County requested a proposal from only one provider. This provider submitted a proposal to the County on March 17, 1981 based on the use of a single site for all the 9 Pennhurst residents. This single site proposal was accepted by the County

and approved by the Commonwealth as a site to accommodate 8 of the 9 Pennhurst residents. However, this acceptance and approval was not accomplished until sometime around the end of June or the early part of July, 1981. This site had been under consideration by Delaware County since the summer of 1980.

The Court finds that as of June 30, 1981, the Delaware County defendants were not in substantial compliance with Paragraph 1 of this Court's Order of March 2, 1981, in that they violated their obligation to act diligently and with steadfast purpose to comply with the Court's Order of March 2, 1981. However, the evidence shows that on August 11, 1981, 7 of the 9 Pennhurst residents from Delaware County ·identified for placement pursuant to Paragraph 1 of the March 2 Order had preplacement visits in their community living arrangements and were in the process of being moved from Pennhurst to the community. The transfer of the remaining 2 Pennhurst residents who were identified by Delaware County for transfer to the community has been delayed in order to make a final determination as to whether their move to a community living arrangement is "voluntary".

*Montgomery County Defendants*

Under the Order of March 2, 1981, the Montgomery County defendants were required to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for 15 residents of Pennhurst on or before June 30, 1981. The defendants' plan submitted to the Court on March 25, 1981, identified 15 Pennhurst residents and 5 other retarded persons for community placement. Montgomery County defendants did not require additional funds from the Commonwealth in order to accomplish such placements.

As of June 30, 1981, only 1 of the 15 Pennhurst residents had been moved from Pennhurst to a community living arrangement pursuant to Paragraph 1 of the March 2 Order. (N.T. July 23, 1981, at 188, 190, 223). The Montgomery County defendants had identified the 15 retarded Pennhurst residents for transfer to the community in October of 1980. Three of the 15 residents were to be moved into vacancies in existing community living arrangements. (N.T. July 23, 1981, at 212). Providers for the remaining 12 retarded Pennhurst residents were selected by Montgomery County on or before March 12, 1981. (N.T. July 23, 1981, at 193, 380–81). The providers' proposals were approved by the Commonwealth and the County on April 24, May 22, May 26, and June 19, 1981. (N.T. July 23, 1981, at 194, 212). In their plan submitted to the Court on March 25, 1981, the Montgomery County defendants set forth some difficulties which might delay compliance with this Court's Order of March 2. However, most of the expected difficulties did not materialize.

As of June 30, 1981, Montgomery County had held an initial individual habilitation plan meeting for only 1 of the 15 Pennhurst residents to be moved to the community pursuant to Paragraph 1 of the March 2 Order.

The Court finds that as of June 30, 1981, the Montgomery County defendants were not in substantial compliance with Paragraph 1 of the Court's Order of March 2, 1981, in that they had violated their obligation to act diligently and with steadfast purpose to comply with the Court's Order. However, the evidence shows that on August 12, 1981, 14 of the 15 Pennhurst residents from Montgomery County identified for placement pursuant to Paragraph 1 of the March 2 Order had been moved from Pennhurst to a community living arrangement and that the 1 remaining at Pennhurst was too ill to be moved at that time.

*Discussion*

■ Liability for civil contempt accrues when a defendant violates an Order, knowing it to have been issued. *Thompson v. Johnson*, 410 F.Supp. 633 (E.D.Pa.1976), *aff'd*, 556 F.2d 568 (3d Cir. 1977). The purpose of a civil contempt remedy is to coerce compliance with the court order and to compensate the party who is the beneficiary of the court order for the failure to

comply. *Cromaglass Corp. v. Ferm*, 500 F.2d 601, 604 (3d Cir. 1974); *U. S. v. Spectro Foods Corp.*, 544 F.2d 1175, 1182–83 (3d Cir. 1976). "The absence of wilfulness does not relieve from civil contempt.... Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).

 In a civil contempt proceeding the proof of the defendants' contempt must be demonstrated by clear and convincing evidence. *Schauffler v. Local 1291, International Longshoremen's Association*, 292 F.2d 182 (3d Cir. 1961). Although defendants' inability to comply with a judicial decree is a valid defense to civil contempt charges, "the federal rule is that one petitioning for an adjudication of civil contempt does not have the burden of showing that the respondent has the capacity to comply.... The contrary burden is on the [defendants]." *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973); *Aspira of New York, Inc. v. Board of Education of the City of New York*, 423 F.Supp. 647, 654 (S.D.N.Y.1976). The relevant inquiry in a civil contempt proceeding is whether the defendants took "all the reasonable steps within their power to insure compliance with the orders." *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976). "[A] finding of civil contempt may be made if it is shown that a party has violated his obligations imposed by a court decree by a failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree." *Jordan v. Arnold*, 472 F.Supp. 265, 289 (M.D.Pa.1979), *appeal dismissed*, 631 F.2d 725 (3d Cir. 1980).

 The Commonwealth defendants substantially complied with Paragraph 1 of this Court's Order of March 2, 1981 in that they acted diligently and with steadfast purpose to comply with the Court's Order. The Court therefore determines that the Commonwealth defendants are not in civil contempt of this Court's Order of March 2, 1981. However, the evidence is clear and convincing that the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants were not in substantial compliance with Paragraph 1 of the Court's Order of March 2, 1981 in that each of these Counties had violated their obligation to act diligently and with steadfast purpose to comply with the Court's Order. As herein found by the Court, on June 30, 1981, the date specified in this Court's Order: Bucks County had moved into a community living arrangement only 1 of the 8 Pennhurst residents identified for transfer; Delaware County had moved into a community living arrangement none of the 9 Pennhurst residents identified for transfer; and Montgomery County had moved into a community living arrangement only 1 of the 15 Pennhurst residents identified for transfer. The evidence offered by these 3 Counties concerning their delay in complying with this Court's Order was less than sufficient to support a finding that these Counties took all reasonable steps within their power to comply with the Court's Order. The Court therefore determines that the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants were in civil contempt of this Court's Order of March 2, 1981.

 As the Court has pointed out, however, after the hearings on the motion for contempt got underway, there was a great burst of activity on the part of these County defendants. As a result of their vigorous efforts, after they were cited for contempt these 3 Counties achieved the following compliance with the Court's Order:

*Bucks County*: On August 10, 1981, Bucks County had moved into a community living arrangement 7 of the 8 Pennhurst residents identified for transfer.

*Delaware County*: On August 11, 1981, Delaware County had completed arrangements to move into a community living arrangement 7 of the 9 Pennhurst residents identified for transfer.

*Montgomery County*: On August 13, 1981, Montgomery County had moved

into a community living arrangement 14 of the 15 Pennhurst residents identified for transfer.

The Court therefore determines that since the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants are now in substantial compliance with this Court's Order of March 2, the imposition of a civil fine is not necessary since it would serve no coercive function. The Court has determined, however, that since the substantial compliance with the Court's Order by these three Counties was not achieved until the hearings on the contempt motion were almost completed, the Court will enter an Order directing the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants to pay reasonable counsel fees and costs to the plaintiffs in connection with the preparation and trial of these contempt proceedings.

The plaintiffs and defendants in these proceedings have exhibited a dedication to provide adequate habilitation for the retarded residents of this Commonwealth. As the Court in *Aspira of New York, Inc., supra*, 423 F.Supp. at 660, stated: "Plaintiffs and their counsel, though the format is adversary pressure, have contributed greatly to the pursuit of share goals."

The evidence presented in these contempt proceedings impressed the Court with the fact that all of the transfers of the retarded residents of Pennhurst to community living arrangements were accomplished by the defendants with great concern for the well-being of the retarded persons. As this Court has often stated, no resident of Pennhurst should be moved into the community unless and until an appropriate living arrangement has been made available with all the necessary services required in accordance with the resident's individual habilitation plan. The transfers from Pennhurst to date have in the main provided each of the retarded residents of Pennhurst such minimally adequate habilitation as will give them the opportunity to acquire and maintain such life skills as are necessary for them to cope with life as effectively as their limited capacities will permit. Although a few of the retarded residents of Pennhurst and their families have demonstrated a reluctance to leave the institution, the overwhelming majority are now happy for the freedom to begin a life which offers the assurance of a better life. It was to accomplish this end that the Implementation Order of March 2, 1981 was issued.