ELI LILLY AND COMPANY, Plaintiff,

v.

MEDTRONIC, INC., Defendant.

Civ. A. No. 83–5393.

United States District Court,
E.D. Pennsylvania.

Feb. 15, 1990.
Amendment Filed Feb. 22, 1990.

Timothy J. Malloy, Lawrence M. Jarvis, Gregory J. Vogler, McAndrews, Held & Malloy, Ltd., Chicago, Ill., Richard G. Schneider, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Philip S. Johnson, Albert W. Preston, Jr., Gary H. Levin, Hendrik D. Parker, Woodcock Washburn Kurtz, Mackiewic & Norris, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DITTER, Senior District Judge.

Before me is plaintiff's motion for an order to show cause why defendant should not be held in contempt for directly violating paragraphs 1 and 3 of the injunction dated April 21, 1988, as modified on June 28, 1989. Upon consideration of the evidence introduced at the contempt hearing, the parties' briefs, and arguments of counsel, I make the following:

### FINDINGS OF FACT

1. Plaintiff Eli Lilly and Company sued defendant Medtronic, Inc. pursuant to 35 U.S.C. § 271(a) (1982) for infringement of claims 1–6 of its U.S. Patent Re. No. 27,757 and claim 1 of U.S. Patent No. 3,942,536. Lilly alleged that Medtronic's development and marketing of its automatic implantable cardioverter defibrillator ("PCD") and its leads used with the PCD infringed Lilly's patents claims.

2. Following a trial on the merits, the jury returned a verdict in favor of Lilly,

having found Medtronic's devices to infringe Lilly's patent claims.

3. On April 21, 1988, I granted injunctive relief to Lilly. The injunction, in pertinent part, reads as follows:

1. Medtronic, Inc., its officers, agents, directors, servants, employees, attorneys, and all others acting in concert with it or through them, are permanently enjoined and restrained from infringing (directly, contributorily, or by inducement) . . . [the Lilly patents] . . . until October 26, 1990, including, but without limitation, by manufacture, distribution, use (including animal and human tests), sale, subassembly in the United States for distribution abroad, or any other activity which would have as its natural or intended purpose the sale of any of the following:

(a) Model 7210 Cardioverter used in connection with the Model 6882 lead;
. . .
(c) Model 7215 PCD or 7216 PCD used in connection with the Lead Models 6891, 6892, 6893, or 6917; . . . .

3. Medtronic, Inc., its officers, agents, directors, servants, employees, attorneys, and all others acting in concert with it or through them, are permanently enjoined and restrained from using in the United States the data generated from the infringing, manufacture, use, or sale of the Model 7210 Cardioverter until March 9, 1993, and the Models 7215 PCD or 7216 PCD until October 26, 1990. Such enjoined activities include, by way of example without limitation, marketing, promoting, showing or displaying said data at medical meetings, investment or stock analysts meetings, shareholder meetings, or other public presentations.

4. Following a reversal by the United States Court of Appeals for the Federal Circuit, 872 F.2d 402 (1989), of my ruling that the testing exemption of 35 U.S.C. § 271(e)(1) is restricted to drugs and does not include medical devices,[1] I modified the injunction to include the following paragraph:

4. As provided in 35 U.S.C. § 271(e)(1), nothing herein shall preclude Medtronic, Inc. from making, using, or selling any Medtronic automatic implantable cardioverter defibrillator device (including but not limited to the Models 7210, 7215, or 7216 PCD devices and/or their associated leads, or any equivalent) solely for uses reasonably related to the development and submission of information to the Federal Food and Drug Administration under an application for an Investigational Device Exemption or under an Investigational Device Exemption duly issued by the FDA.[2]

5. Dr. Douglas P. Zipes is a consultant and a senior research investigator for Medtronic. Zipes has been a consultant for Medtronic since 1975. Zipes and Medtronic have an exclusive arrangement which provides that:

a. Medtronic will pay Zipes approximately $40,000 per year in exchange for consulting services performed by Zipes in the cardiac rhythm disturbances field. Zipes is paid approximately $10,000 four times a year by Medtronic.

b. Medtronic will pay Zipes $1,500 twice a year for chairing one-day Medtronic tachyarrhythmia seminars with other Medtronic consultants.

c. Medtronic will pay Zipes an honorarium of $1,000 each time he serves on the faculty of a Medtronic-sponsored program.

d. Medtronic will reimburse Zipes for travel, food, lodging, and other expenses incurred at Medtronic's request during the tenure of the agreement.

e. Medtronic will reimburse Zipes for expenses incurred, up to a limit of $10,000, for travel to a program of Zipes' choosing at any geographic location if Zipes will be lecturing on material related to his consulting activities.

---

**1.** On October 10, 1989, the United States Supreme Court granted Lilly's petition for certiorari to review the narrow issue of whether the testing exemption of 35 U.S.C. § 271(e)(1) applies to medical devices or is limited to drugs.

**2.** Medtronic does not claim that the accused contemptuous activities are within this statutory exemption.

Medtronic/Zipes consulting agreements dated September 9, 1987. Beginning with the 1989 consulting agreement, Zipes will receive $42,000 in base compensation, the other payments, reimbursements, honoraria, and benefits, and in addition, upon his request, a $10,000 research grant. Medtronic/Zipes consulting agreement dated September 27, 1989.

6. Under the consulting agreement, Zipes advises Medtronic on medical and engineering decisions, sits on in-house panel discussions, attends Medtronic research and development meetings, and makes presentations on behalf of Medtronic at seminars throughout the country. Medtronic/Zipes consulting agreements dated September 9, 1987, and September 27, 1989, at Sect. I(B).

7. Zipes developed for Medtronic the infringing Model 7210 cardioverter, sometimes called the Zipes cardioverter. Additionally, Zipes consulted with Medtronic on the development of the Medtronic 7215 and 7216 PCD's.

8. Zipes admits that much, if not all, of his information on the functions and capabilities of these devices came from his association with Medtronic. Zipes' Dep., at 34.

9. In addition to his Medtronic duties, Zipes lectures to cardiologists and other medical specialists. Zipes' Dep., at 121. From April 21, 1988, to November, 1989, Zipes made between ten and twenty such presentations. Zipes' Dep., at 89. He gives essentially the same lecture on tachyarrhythmia devices each time, spending equal time discussing the Lilly and Medtronic devices at issue in this case. Zipes' Dep. 89–91, 132.

10. Medtronic was at all times aware of the content and tenor of Zipes' presentations.

11. Immediately following the issuance of the injunction in this case, Medtronic sent Zipes a letter dated May 3, 1988, informing him that he "could violate the order of injunction" by continuing to present his standard lecture. Med.'s Mem. in Opp.,

Attachment E. The letter quoted paragraph 3 of the injunction verbatim and included a statement informing Zipes that the injunction restrains anyone from using the data generated from the investigation of the infringing devices. *Id.*

12. In addition to the letter, a number of Medtronic employees apprised Zipes of the injunction and its intended effect and told him to curtail the presentation of data relating to the PCD's in his lectures. Zipes' Dep., at 25, 37–38. These statements continued periodically over the past two years. Zipes' Dep., at 122. Zipes was told by Medtronic "ad nauseam" that he could not present data about the 7210, 7215, or 7216 PCD's. Zipes' Dep., at 128.

13. Zipes did not abide by these restrictions. He views himself as an educator, scientist, and physician. He believes that Medtronic's "wranglings" with Lilly have nothing to do with him. Zipes' Dep., at 38.

14. The termination, suspension, or diminution of Zipes' consulting agreement with Medtronic was never discussed as a possible sanction if Zipes violated Medtronic's "requests" that he stay within the bounds of the injunction. Zipes' Dep., at 157.

15. In September, 1988, Zipes gave his standard lecture before a large audience of cardiologists and medical device company representatives, including representatives from Lilly and Medtronic. Following his lecture, a Medtronic representative told Zipes that "we've got this injunction and you're disregarding the injunction." Zipes' Dep. at 153. Zipes responded: "that's absolutely right." *Id.* Despite Medtronic's knowledge that Zipes was aware of the injunction and that he was violating it, Medtronic continued to retain him as a consultant.

16. In September, 1989, Zipes lectured to 1,000 cardiologists preparing for a board certification examination. Zipes was appearing at the request of the American College of Cardiology. His presentation was entitled "Surgery and Electrical Treatment of Arrhythmias." [3] One of the areas

---

**3.** Counsel provided me with both an audiotape and a transcription of the relevant portions of Zipes' lecture.

of presentation was the treatment of tachyarrhythmias with electrical therapy devices.[4]

17. As was his common practice, Zipes began his lecture with a discussion of Lilly's automatic implantable cardioverter defibrillator ("AICD"). Zipes' Dep., at 90. He referred to the AICD as "the device that's taken the world by storm," discussed its advantages and its drawbacks, and reviewed data on the effectiveness of the AICD as a safe treatment device for tachyarrhythmia. Zipes' Transcript, at 2–6.

18. The second portion of his presentation focused on what Zipes called the "Rolls Royce" of tachyarrhythmia treatment devices, the Medtronic PCD. Zipes' Transcript, at 6. He described the PCD's "marvelous memory" and its other improvements over the Lilly AICD. Zipes' Transcript, at 6–10. Additionally, Zipes discussed Medtronic's plan to decrease the size of the PCD. Zipes' Transcript, at 9–10. Zipes made it clear that in his opinion the PCD is a vastly more flexible and better device for treating patients. Zipes' Dep., at 93–94.

19. As part of his presentation, Zipes used slides he obtained from Dr. George Klein, another Medtronic consultant and one of Medtronic's Canadian investigators of the PCD. Zipes' Dep., at 11, 35; Zipes' Transcript, at 8–9. Klein and Zipes met while serving on a tachyarrhythmia committee, solely comprised of Medtronic consultants. Zipes' Dep., at 11. Klein provided Zipes with data from the implantation of a PCD in one of Klein's Canadian patients.

20. In conjunction with the celebration of Medtronic's fortieth anniversary in 1989, Medtronic is currently sponsoring a touring museum exhibit entitled "Bionics and Transplants: The World of Replacement Medicine."[5] The exhibit will tour science museums across the United States until January 1992. The exhibit includes many displays of various life-enhancing technologies in eight practice areas, such as organ transplantation and circulation.

21. At the exhibit's entrance Medtronic is acknowledged as corporate sponsor. Appendix A to the Affidavit of Pohlman. Other acknowledgements are made within each display to contributors or inventors. The Medtronic name is prominently featured in most of the pacemaker displays.

22. According to Medtronic's 1989 Annual Report, page 28, the exhibit is "expected to increase the public's understanding of Medtronic's businesses and highlight the company's leadership in the development of life-enriching technologies. It will also provide an excellent opportunity for employees, civic leaders, legislators, investors, and patients in the various communities to see the company's technologies up close. Medtronic expects more than 3.6 million persons to view the exhibit by tour's end in 1992."

23. The exhibit includes a display entitled "Implantable Pacemaker/Defibrillator." The display was created and arranged by Donald Pohlman, an employee of the Science Museum of Minnesota. Pohlman's Aff., at ¶ 4. In assembling the display, Pohlman used equipment and gathered information from a number of sources. One of the sources of information on defibrillation is a subsidiary of Lilly, Physio–Control Corporation. Pohlman's Aff., at ¶ 11. Physio–Control is credited in the display.

24. A mock-up of an implantable pacemaker cardioverter defibrillator is included in the display. The parts for this mock-up were obtained from Medtronic. Pohlman's Aff., at ¶ 11; Med.'s Mem. in Opp., at 10. Medtronic supplied Pohlman with an empty PCD can, two patch leads, and a screw-in lead. These items were found to be infringements of the Lilly patents and are the subject of the instant injunction. Medtronic's name does not appear on the in-

---

4. Zipes admits, however, that no questions would be posed on the examination about product trademarks or specific products of a particular manufacturer. Zipes' Dep., at 163.

5. Although I have not visited the exhibit, which at the time of the hearing was in Ft. Worth, Texas, I have reviewed a videotaped tour of the exhibit provided to me by Medtronic. Attached as Appendix A to the Affidavit of Pohlman.

fringing items nor anywhere else in the display.

25. Medtronic's 1989 Annual Report includes a two-page section on Medtronic's PCD's. On page 16, Medtronic presents information relating to the development of the PCD's. Medtronic refers to the potential market for the PCD's in both the United States and elsewhere and describes the PCD's functions. Medtronic relates that the PCD's are currently undergoing testing in Europe. A full-color photograph of the infringing devices appears on the facing page, page 17. There are no references on pages 16 and 17 to the litigation with Lilly, nor to page 4 or page 44, note 12 of the annual report.

26. On pages 4 and 44 of the 1989 Annual Report and on page 2 of the Fiscal 1990 First Quarter Report, Medtronic outlines a procedural history of the litigation between Lilly and Medtronic. Note 12 on page 44 details the status of this case. There is no reference on this page to pages 16 and 17. The status of the case was updated in the 1990 First Quarter Report. In each instance, Medtronic maintains that a favorable outcome is anticipated.

*Discussion*

I

Medtronic chose to follow a course of conduct that put it squarely at odds with the injunction on at least three occasions. Consequently, Medtronic is in contempt of the injunction issued on April 21, 1988, as modified on June 28, 1989.

■ As in any civil contempt proceeding, Lilly has the burden of proving that Medtronic violated the injunction by clear and convincing evidence.[6] *Schauffler v. Local 1291, International Longshoremen's Association,* 292 F.2d 182 (3d Cir.1961). Although Lilly presented evidence that Medtronic willfully violated the injunction, contempt will lie absent a finding of willful-

ness. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Once the prima facie case of contempt is established,[7] to ward off a finding of contempt, Medtronic must create a doubt as to the wrongfulness of its conduct by raising defenses or other mitigating circumstances. *Schauffler,* 292 F.2d at 189–90.

*A. Dr. Zipes*

■ My order of April 21, 1988, precludes Medtronic, its agents, and all others acting in concert with it, from promoting Medtronic's infringing devices. Despite the clarity of the injunction and Medtronic's telling Zipes he was violating it, Medtronic has deliberately encouraged him to do so by raising his pay and adding to his fringe benefits. It is of no consequence that Zipes is not an everyday employee of Medtronic, or that he receives only one-eighth of his yearly income from Medtronic. Zipes' interests are so aligned with Medtronic's that he is plainly a Medtronic agent when he promotes Medtronic PCD's. A corporation can only act through human hands; Zipes provides the hands by which Medtronic acts. Medtronic violated paragraph 1 of the injunction by engaging through Zipes in activities that have as their "natural and intended purpose the sale" of the infringing PCD.

Typical was Zipes' appearance before a thousand cardiologists who were preparing for a board-certification examination in September, 1989. Since each of these doctors was eager to become certified, as evidenced by the fact that each had paid $450 to $500 to attend the sessions, it may be assumed they listened closely. Without telling these potential customers that he was a paid consultant of Medtronic, Zipes "educated" them on the PCD's "marvelous" features. This is particularly noteworthy since Zipes knew there would be no product-specific questions on the exam.

---

6. While the inferences to be drawn from the evidence presented by the parties may be a matter of controversy, there is no dispute over the evidence itself. Both parties agree that all of the acts at issue in this proceeding occurred.

7. To establish a prima facie case of contempt, Lilly need only show that (1) a court order is in effect; (2) the order prescribes certain conduct by Medtronic; and (3) Medtronic performed an act or failed to perform an act in violation of the court order.

Plainly the praise lavished on the PCD and the unfavorable references to Lilly's AICD was not for the benefit of the thousand cardiologists—but for the benefit of Medtronic. Zipes took advantage of a captive audience to give Medtronic a jump-start on sales it will make when Lilly's patent expires.

■ Medtronic also violated paragraph 3 of the injunction by permitting Zipes to use Klein's data in his presentations and by giving Zipes product information to convey to potential purchasers of the PCD. Both the Klein data and the Medtronic product information were generated from the manufacture, distribution, use, or sale of the infringing devices in the United States.[8] Paragraph 3 could not be clearer. The "showing or displaying said data at medical meetings" is a prohibited act. Medtronic knew the risk associated with letting Zipes present his standard lecture using data generated from the investigation of the infringing devices. This is certainly evidenced by Medtronic's letter to Zipes of May 3, 1988. Med.'s Mem. in Opp., Attachment E. The letter cautioned Zipes that use of data in his lectures would be a violation of paragraph 3 of the injunction. *Id.* Furthermore, Medtronic's repeated statements to Zipes about his "disregarding the injunction" show an understanding of exactly what the injunction prohibits in the way of conduct. However, instead of sanctioning Zipes for promoting its PCD's, Medtronic gave Zipes a $2,000 raise and a $10,000 research grant in recognition of "a relationship [that] has been extremely rewarding" and in the hope of "continued collaborative success." Medtronic/Zipes consulting agreement dated September 27, 1989.

Medtronic suggests that it can hardly be blamed for what Zipes does. Zipes himself makes it plain that because he is an educator, a scientist, and a physician, he is above the law—that Medtronic's "wranglings" with Lilly have nothing to do with him and that he will continue to say whatever he wants, whenever he wants, and to whomever he wants. Medtronic's response to Zipes' assertions was to raise his pay and add to his fringe benefits. So blessed and encouraged by his benefactor, Zipes has made it clear he will continue his practice of peddling the PCD's. Perhaps there could be a better way for Medtronic to tout the PCD than through Physician–Scientist–Educator Zipes, but if so, no one has suggested what that better way would be. No one should be surprised that he is promoting the PCD's and that Medtronic has not been able to think of any way to get him to stop.

Medtronic should have taken "all the reasonable steps within its power to insure compliance with" my order. *Halderman v. Pennhurst State School and Hospital,* 526 F.Supp. 414, 422 (E.D.Pa.1981). It did nothing. "A finding of civil contempt may be made if it is shown that a party has violated his obligations imposed by a court decree by a failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree." *Id.,* (quoting, *Jordan v. Arnold,* 472 F.Supp. 265, 289 (M.D.Pa.1979), *appeal dismissed,* 631 F.2d 725 (3d Cir.1980)).[9] Medtronic's so-called attempts to control Zipes fall far short of what is needed to stave off a finding of contempt. Telling Zipes that he was violating the injunction while stuffing money in his pockets does not show much effort to comply with my order. It is not difficult to see that Zipes ignored Medtronic's words because Medtronic gave him no reason to take them seriously. Medtronic's inability to persuade Zipes can only be ex-

---

8. Although Klein's data was developed as a result of the study of the effectiveness of PCD's implanted in Klein's Canadian patients, all of Klein's PCD's were manufactured in and distributed from the United States. *See* Lilly's Reply Brief, at 7, n. 4; Lilly's proposed findings of fact, ¶ 18.

9. *Accord, Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 353, n. 13 (7th Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976) ("The orders of the Court must be obeyed, and to absolve a large or small corporate defendant from its responsibilities simply because the corporation has ordered compliance but has not sufficiently policed same, would be to open the door for wholesale disobedience of the Court.").

plained by the fact that it is in Medtronic's best interest to have an eminent cardiologist and professor plugging its products.

Medtronic maintains there is simply nothing it can do to stop Zipes. But it has failed to threaten—much less take—the most obvious step: terminate its association with Zipes, i.e., stop paying him a salary, honoraria, expenses, and grants; give him no information; receive no services, information, or knowledge from him. In short, sever all contacts with him.

Medtronic contends that I should focus on what Zipes has done for Lilly both during the lectures and at other medical meetings where Zipes represented Lilly. Medtronic asserts that Zipes spent as much time in the lectures discussing the Lilly AICD (apparently stressing its shortcomings) as he spent promoting the virtues of Medtronic's PCD and that Zipes has represented Lilly on occasion at medical seminars around the country. However, I am not concerned with how or through whom Lilly promotes its products. It is the time spent by Zipes promoting Medtronic's infringing devices that concerns me. Following the trial in my courtroom, it was Medtronic, not Lilly, that was found to be the infringer; therefore, it is Medtronic, not Lilly, that must abide by the terms that I set to remedy the infringement. Only Medtronic, not Lilly, can violate the injunction, and Medtronic does so when it allows Zipes to spend *any time* promoting the Medtronic PCD's.

### B. Implantable Pacemaker Defibrillator Display

■ Medtronic argues that because Medtronic's name does not appear in the implantable pacemaker defibrillator display and because the ordinary museum visitor cannot identify the mock-up parts as originating from Medtronic, it cannot be held in contempt for violating paragraph 1 of the injunction for engaging in an activity which has as its natural or intended purpose the sale of the PCD. Medtronic also maintains that it cannot be held responsible for the display's content because Pohlman designed it. These contentions belie both the facts presented and the expressed intentions of Medtronic.

First, while it is true that the Medtronic name does not appear in the implantable defibrillator display, Medtronic is recognized prominently as corporate sponsor of the exhibit in its entirety and in numerous individual displays. After reviewing the videotaped tour of the exhibit, I conclude that the Medtronic name is sufficiently presented to museum visitors at the entrance to the exhibit and in the pacemaker displays to create the perception that the implantable defibrillator on display was made by Medtronic.

Second, even if some or most of the visitors to the display could not identify the device as the infringing PCD, it is a sufficient ground for a finding of contempt if Medtronic engaged in an "activity which would have as its natural or intended purpose the sale" of the infringing devices. The key issue is not whether visitors to the museums are in fact influenced to purchase Medtronic PCD's because of the display, but whether Medtronic intended the visitors to the museum to be influenced to purchase Medtronic PCD's because of the display. Medtronic need not be successful in generating future sales of the PCD before a citation for contempt may issue. Even an attempt to generate sales of the PCD is prohibited. Medtronic's 1989 Annual Report, page 28, clearly shows that the intended purpose of the exhibit was to increase the public's understanding of Medtronic businesses and products and to provide "an excellent opportunity for ... investors, and patients ... to see the company's technologies up close." The Annual Report shows that investors and patients, the individuals who either buy Medtronic stock or Medtronic products, were among the target groups for the promotion of all of the Medtronic products on display, including the PCD.

Third, the mere fact that Pohlman designed and created or supervised the design and creation of the display does not absolve Medtronic from culpability for its wrongful decision to provide Pohlman with the automatic implantable pacemaker cardi-

overter defibrillator can and associated leads. The inclusion in the display of the very devices that were found to be infringing Lilly's patent violates paragraph 1 of the injunction. Medtronic infringed directly, contributorily, and by inducement Lilly's patents by manufacturing, distributing, and using the PCD can in a promotional display. Medtronic should have refused Pohlman's request for an implantable defibrillator. It certainly should not have given him any part of the infringing implantable pacemaker cardioverter defibrillator. The very fact that Medtronic provided Pohlman with the PCD can, instead of declining Pohlman's request or directing him elsewhere for a mock-up of an implantable defibrillator, shows that Medtronic intended to use the opportunity to give its infringing device national exposure in the name of "philanthropy." This promotional exposure is a violation of the injunction.

## C. Medtronic 1989 Annual Report

 The two-page PCD section in the 1989 Annual Report is another example of Medtronic's campaign to promote the infringing PCD and associated leads before Lilly's patent expires in October, 1990. Medtronic's feature on the PCD is an activity which has as its natural or intended purpose, the sale of that device; as such, it is a violation of paragraph 1 of the injunction. Medtronic knows that it cannot advertise in medical journals or on television hyping the arrival of the PCD, so Medtronic adopted an indirect, but no less effective, strategy of promoting the infringing device.[10] The annual report is nothing more than an advertisement for Medtronic and its products, which happens to be sent to shareholders instead of journal subscribers or television viewers. The annual report, like Zipes' lectures or the museum exhibit, is seen by a wide variety of individuals, any one of whom could be a potential purchaser of a PCD. I see no reason to distinguish between forms of promotion, when the injunction clearly prohibits all forms of marketing or promotion of the infringing devices.

Medtronic argues that if the recipients of the annual report read it cover-to-cover they "would be fully aware of the injunction, the status of this case, and that Medtronic's devices are not commercially available in the United States." Med.'s Mem. in Opp., at 7. I find that this proposition is frivolous in a number of respects. First, it is a bold assumption that the annual report is read in its entirety. Any individual with even a passing familiarity with the lay-out of an annual report knows that the negative information pertaining to the company is buried where few readers venture, in the notes' fine print at the back of the report.

Second, Medtronic is mistaken in its contention that a reader of the annual report will be fully aware of the injunction. After seeing note 12 on page 44, the shareholder or market analyst will only know that an injunction was entered in this case which prohibits "the company from making, using, or selling certain implantable devices with defibrillation capabilities in the United States until after certain patent rights have expired." The reader may not realize that the device pictured on page 17 of the report is one of the "implantable devices with defibrillation capabilities" subject to the injunction. There is no reference on either page 16 or 17 directing the reader to page 44, note 12, or vice versa. The reader will certainly not know that Medtronic is prohibited from engaging in any "activity which has as its natural or intended purposes the sale" of infringing devices. Nor will the reader be cognizant of the prohibited acts enumerated in paragraph 3 of the

10. Medtronic also knows that it cannot display or photograph the PCD with the Medtronic name prominently featured. That is why the PCD displayed at the museum and the photograph of the PCD in the annual report do not have the Medtronic name on them. Every other Medtronic pacing product on display in the exhibit or photographed for inclusion in the annual report has the Medtronic name and logo on the front of the device. Medtronic apparently, and mistakenly, believes that the removal of the Medtronic name from the infringing devices insulates Medtronic from violating the injunction. However, what is truly apparent is that Medtronic's feeble attempt at disguise is just another example of its intention to disregard my order.

injunction or the limited scope of the testing exemption of 35 U.S.C. § 271(e)(1). Most certainly, the reader will not be aware that the injunction prohibits Medtronic from including in its annual report promotional material concerning the "Rolls Royce" of "implantable devices with defibrillation capabilities," the Medtronic PCD.

Third, the fact that the PCD is not commercially available for sale in the United States market does not prevent Medtronic from violating the injunction; therefore, it is irrelevant whether Medtronic did or did not create the false impression in its annual report that the PCD was available for sale in the United States. The important issue is whether the PCD section in the annual report is intended to create sales of the PCD upon its entry into the United States. The injunction is designed to prevent Medtronic from touting the advantages of the PCD before its formal introduction into the United States. Any efforts to increase future sales of the PCD are prohibited under the injunction, as Medtronic well knows.

II

### A. Post–Injunction Infringement

[■] Relying on *KSM Fastening Systems, Inc. v. H.A. Jones Company, Inc.*, 776 F.2d 1522 (Fed.Cir.1985), Medtronic asserts that only a showing of a "post-injunction infringement" will support a finding of contempt. However, Medtronic mistakenly concludes that an infringement requires a showing that Medtronic made, used, or sold an infringing device. Post-injunction infringement, and in turn, contempt, is determined by reference to the terms of the injunction. Even the court in *KSM* noted, "the issue in contempt proceedings is violation *vel non* of the injunction, not patent infringement." *KSM*, 776 F.2d at 1528. *See also*, Med.'s Mem. in Opp., at 6. ("The issue in a contempt proceeding is whether or not there has been a violation of the injunction.").

Thus, the first step in deciding whether a finding of contempt is warranted is to determine what acts are prohibited by the injunction. In *KSM*, the defendant introduced into the market a second device which was neither the subject of the origi-

nal litigation nor covered by the injunction. The *KSM* injunction only restrained the "making, using or selling" of the infringing device. As in all cases, in order to establish a prima facie case of contempt, the *KSM* plaintiff had to produce evidence of a violation of the injunction, i.e., a "making, using or selling" of an infringing device. The injunction at issue here is more expansive in that in addition to restraining Medtronic from making, using, or selling an infringing device, it also precludes Medtronic from engaging in "any other activity which would have as its natural or intended purpose the sale of" the infringing device and from distributing or displaying data generated from the infringing device. Medtronic's actions and intentions are clear—it has been actively engaged in the promotion of the PCD's.

### B. Ambiguity in the Injunction

[8] Medtronic further maintains that the injunction is so ambiguous as to make a finding of contempt unfair. Medtronic posits that the injunction does not give adequate notice to Medtronic of what it actually prohibits. Fed.R.Civ.P. Rule 65(d) requires every injunction to be "specific in terms" and to "describe in reasonable detail ... the act or acts sought to be restrained." However, Rule 65(d) does not require the court to be omniscient. It would be impossible for a court to draft an order that covers every eventuality. *See, e.g., Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir.1985). ("There is a limit to what words can convey. The more specific the order, the more opportunities for evasion ('loopholes'). There are a million possibilities. ... Any effort to identify and prohibit one million of them would have left another million or more subject to dispute."). Rule 65(d) imposes a reasonableness standard for testing the clarity of an injunction. This injunction is reasonable in its scope and detail. It provides Medtronic with the means to ascertain what is and what is not a prohibited act.

[■] If Medtronic was in doubt over the meaning of the injunction, Medtronic had

the duty to come forward and seek a clarification or a modification of the injunction before promoting the PCD's orally, in writing, and by exhibit. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949); *National Research Bureau, Inc. v. Kucker*, 481 F.Supp. 612, 615 (S.D.N.Y.1979). Because Medtronic failed to seek guidance from the court, it acted at its peril.

I do not believe Medtronic's assertions that it found the injunction to be so ambiguous that it was incapable of determining what acts were or were not in violation of the injunction. For example, Medtronic had no trouble ascertaining from the injunction that Zipes was presenting data during his lectures in violation of the injunction. The May 3, 1988, letter from Medtronic to Zipes clearly shows that Medtronic knew that paragraph 3 of the injunction precluded Zipes from discussing or presenting data concerning the PCD. Med.'s Mem. in Opp., Attachment E. Moreover, Medtronic knew that Zipes continued to disregard the injunction by promoting the PCD during his seminar presentations. In fact, Medtronic's entire course of conduct flies in the face of its bold assertion that the injunction is so ambiguous as to be of no help to Medtronic. I have no trouble in concluding that from the moment the injunction was issued, Medtronic knew what the boundaries of acceptable conduct were and that its statements to the contrary are false.

*C. First Amendment*

■■■■ Lastly, Medtronic defends its actions on the ground that the First Amendment permits the dissemination of "scientific and educational information (such as that presented in a museum exhibit or at a board review lecture) ... unless there is a vital government interest to the contrary." Med.'s Mem. in Opp., at 21. In reply, Lilly cogently argues that freedom of speech is not unlimited and may be restrained as a remedy against an infringer. Lilly's Mem. in Support, at 13–14. The vital government interest is the protection of the patent from acts that threaten its sanctity. Reasonable restraints may be placed on an infringer to both eliminate the consequences of past bad acts and to prevent further encroachment on the patent. This injunction cuts no more deeply into Medtronic's right of free speech than is necessary under the circumstances. The First Amendment cannot save Medtronic from contempt.

**III**

In sum, Lilly has shown by clear and convincing evidence that Medtronic has violated the injunction dated April 21, 1988, and as modified on June 28, 1989, by permitting one of its agents to market and promote the infringing devices, by permitting one of its agents to display data relating to the infringing devices, by displaying infringing devices in a promotional museum exhibit, and by including promotional material relating to the infringing devices in its 1989 Annual Report. Accordingly, I find Medtronic in willful contempt of this court for violation of my injunction of April 21, 1998, as modified on June 28, 1989.

**IV**

■■■■ The sanctions imposed for civil contempt may be remedial or coercive. *United States v. United States Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947). A compensatory fine may be assessed against a willful contemnor to be paid to the injured party. *International Brotherhood of Teamsters v. Western Pennsylvania Motor Carriers Assoc.*, 660 F.2d 76, 84 (3d Cir.1981). Hence, I will order that Medtronic reimburse Lilly for its costs and attorney's fees generated by the prosecution of this contempt action. I also will order Medtronic to sever all ties with Zipes and to state in writing to every Medtronic agent, consultant, employee, investigator, or individual acting in concert with or on behalf of Medtronic its intent to terminate all relational agreements with persons who publicly promote or display information or data relating to the Medtronic PCD devices, to cease providing product information or investigative data regarding the Medtronic PCD devices to any person in the United States other than approved in-

vestigators, to place a disclaimer in the implantable pacemaker defibrillator display, and to include the relevant portions of the injunction and any other information relating to Medtronic's contemptuous activities in an interim report from Medtronic to be sent on or before March 12, 1990 to all recipients of the 1989 Annual Report.[11]

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. Medtronic, Inc., is bound by the injunction dated April 21, 1988, as modified on July 28, 1989.

3. Medtronic violated paragraph 1 of the injunction dated April 21, 1988, as modified on July 28, 1989, on each occasion that Medtronic permitted Dr. Douglas P. Zipes, a Medtronic consultant and senior research investigator, to engage in an infringing activity which has as its natural or intended purpose the sale of the Medtronic 7215 PCD or the Medtronic 7216 PCD. These violations occurred between ten and twenty times between April 21, 1988, and November, 1989, and more specifically, in September, 1988, and September, 1989. *See, infra*, at ¶¶ 9, 15, and 16.

4. Medtronic violated paragraph 3 of the injunction dated April 21, 1988, as modified on July 28, 1989, when Medtronic permitted Zipes to use in the United States the data generated from the infringing manufacture, use, or sale of the Medtronic 7215 or 7216 PCD's. *See, infra*, at ¶¶ 11, 12, and 19.

5. Medtronic violated paragraph 1 of the injunction dated April 21, 1988, as modified on July 28, 1989, when Medtronic provided the automatic implantable defibrillator can and associated leads for display in the museum exhibit. The inclusion of the

can and associated leads is an infringing activity which has as its natural or intended purpose the sale of the Medtronic 7215 PCD or the Medtronic 7216 PCD. *See, infra*, at ¶¶ 23 and 24.

6. Medtronic violated paragraph 1 of the injunction dated April 21, 1988, as modified on July 28, 1989, when Medtronic included a two-page feature on the Medtronic PCD in its 1989 Annual Report. The article in the annual report is an infringing activity which has as its natural or intended purpose the sale of the Medtronic 7215 PCD or the Medtronic 7216 PCD. *See, infra*, at ¶¶ 25 and 26.

7. The injunction dated April 21, 1988, as modified on July 28, 1989, is not ambiguous.

8. Medtronic is in willful contempt of the court ordered injunction dated April 21, 1988, as modified on July 28, 1989.

An order follows.

## ORDER

AND NOW, this 15th day of February, 1990, having concluded that Medtronic, Inc. is in willful contempt of my order of April 21, 1988, as modified on June 28, 1989, the following relief is hereby ordered.

1. Medtronic shall announce in writing on or before March 1, 1990, to all of its consultants, investigators, officers, agents, directors, servants, employees, and attorneys its intention to terminate all consulting or other relational agreements with persons who engage in any activity which has as its natural or intended purpose the sale of the Medtronic PCD devices.

2. This announcement shall include the entire text of the injunction dated April 21, 1988, and the introduction and paragraph 4 of the modification dated June 28, 1989.

11. An order relating to the annual report was issued on December 5, 1989. I ordered, inter alia, that Medtronic include certain language in its Fiscal 1990 Second Quarter Report, include relevant portions of the injunction in the report, and submit the report to me for approval before issuance. On December 6, 1989, Medtronic appealed to the United States Court of Appeals for the Federal Circuit, No. 90–1110, from this order. On that same day, Judge Nies of the Feder-

al Circuit temporarily stayed my order pending the outcome of the appeal. On December 13, 1989, the Federal Circuit vacated my order, citing the "lack of findings and reasonings." As a result of this action, Medtronic proceeded with a printing of the Fiscal 1990 Second Quarter Report without the ordered inclusions. The next report is to be issued on March 15, 1990. I will order Medtronic to include similar language in the Fiscal 1990 Third Quarter Report.

3. Medtronic shall cease to provide information or data on the Medtronic PCD devices to anyone in the United States other than to approved investigators of Medtronic's PCD devices.

4. Prior to the distribution of information or data on Medtronic's PCD devices to approved investigators, Medtronic shall announce in writing to such investigators its intention to terminate all consulting or other relational agreements, if the investigators promote the Medtronic PCD devices, engage in any activity which has as its natural or intended purpose the sale of any of the infringing devices, or display or disseminate data or other product information relating to the Medtronic PCD at medical meetings, investment or stock analysts meetings, shareholder meetings, or other public or private presentations.

5. This announcement shall include the entire text of the injunction dated April 21, 1988, and the introduction and paragraph 4 of the modification dated June 28, 1989.

6. Effective immediately, Medtronic shall terminate all of its agreements with Douglas P. Zipes, M.D., and Medtronic shall make no payments to him for salary, consulting fees, honoraria, expenses, reimbursements, fringe benefits, or anything else. Medtronic shall make no provision, implicit or explicit, to pay Zipes in the future for any loss to Zipes that this order causes.

7. Effective immediately, Medtronic shall not employ or engage Douglas P. Zipes, M.D., as a consultant, investigator, or in any other capacity.

8. Effective immediately, Medtronic, its consultants, investigators, officers, agents, directors, servants, employees, and attorneys shall provide no services, data, advice, or information to Douglas P. Zipes, M.D., or shall accept services, data, advice, or information from him.

9. On or before March 1, 1990, Medtronic shall cause Douglas P. Zipes, M.D., to return to Medtronic all PCD devices, leads, materials, instruments, information, or data obtained either from Dr. Zipes' own investigations, from the investigations of other Medtronic consultants or investigators, or from Medtronic or its officers, agents, directors, servants, employees, or attorneys.

10. Medtronic shall terminate any agreement with any consultant, investigator, officer, agent, director, servant, employee, or attorney, if upon application to this court, it is determined that he or she promotes the infringing devices, engages in any activity which has as its natural or intended purpose the sale of any of the infringing devices, or displays or disseminates data or other product information relating to the infringing devices at medical meetings, investment or stock analysts meetings, shareholder meetings, or other public or private presentations.

11. Medtronic shall include in its Fiscal 1990 Third Quarter Report the following:

Further events have transpired regarding the company's legal dispute with Eli Lilly and Company relating to Medtronic's PCD devices. An injunction against certain of Medtronic's activities remains in effect. Until the expiration of the applicable Lilly patents, the current injunction prohibits the manufacture, use, distribution, or sale of the PCD device "or any other activity which would have as its natural or intended purpose" the sale of the Medtronic device with its associated leads, except that there is no prohibition of activities solely for uses reasonably related to the development and submission of information to the FDA. The district court has ordered Medtronic to publish the relevant text of the injunction currently in effect because the court found Medtronic violated the terms of the court's injunction by promoting the Medtronic PCD to potential customers through a retained consultant, by promoting the Medtronic PCD in a touring museum exhibit, and by including promotional material about Medtronic's PCD in the 1989 Annual Report. The relevant text of the injunction is set forth below.

12. The Fiscal 1990 Third Quarter Report shall include the entire text of the injunction dated April 21, 1988, and the

introduction and paragraph 4 of the injunction as modified on June 28, 1989. The quoted portions of the injunction shall immediately follow the above paragraph.

13. No other language referring to this action shall be included in the Fiscal 1990 Third Quarter Report.

14. The Fiscal 1990 Third Quarter Report shall be submitted to this court for approval before it is issued.

15. The Fiscal 1990 Third Quarter Report shall be sent to all recipients of the Medtronic 1989 Annual Report. Medtronic shall present to the court an affidavit stating that the Fiscal 1990 Third Quarter Report was sent to all recipients of the Medtronic 1989 Annual Report.

16. The Fiscal 1990 Third Quarter Report shall be postmarked for delivery on or before March 15, 1990.

17. Medtronic shall cause the following statement to be included in the implantable pacemaker/defibrillator display currently part of the touring exhibit, "Bionics and Transplants: The World of Replacement Medicine":

The displayed combination pacemaker/defibrillator is not the device of any particular manufacturer.

18. The aforementioned statement shall appear in the display directly below the text in the panel which includes the mock-up of the can.

19. The aforementioned statement shall appear in the same typeface and same color as that used to credit particular manufacturers within the displays.

20. The aforementioned statement shall remain in the implantable pacemaker/defibrillator display until October 26, 1990.

21. Medtronic shall pay Lilly's costs, expenses, and reasonable attorney's fees associated with this contempt proceeding.

22. Medtronic's request for a stay of this order is denied.

23. This order shall not preclude Lilly's seeking additional relief and damages resulting from the violation of the order of April 21, 1988, as modified on June 28, 1989.